STATE, EX REL. HAUCK, *v.* BACHRACH ET AL.*

(No. 8428—Decided March 31, 1958.)

*Messrs. Paxton & Seasongood, Mr. Reuven J. Katz* and *Mr. Arnold Morelli,* for relator.

*Mr. James W. Farrell, Jr.,* city solicitor, for respondents.

MATTHEWS, J.   This action in mandamus, originating in this court, presents a controversy as to the distribution of power and the effect of the exercise of such powers by one upon the exercise of power by the other, between the Council of the city

---

*Judgment affirmed, 168 Ohio St., 268.

of Cincinnati and the Board of Park Commissioners of the city of Cincinnati, both of which were created by the people by the adoption of a charter under the authority of Section 7 of Article XVIII of the Constitution of Ohio.

The relator claims the right to sue in three different capacities—as a resident, a citizen, and a taxpayer.

The respondents claim relator is not a proper party to maintain this action in any capacity. They admit that he is a taxpayer, that he made timely demand upon the city solicitor to file an action, and that the solicitor refused; but they point to the provision of Section 733.61, Revised Code, that if the taxpayer is successful, he would be entitled to his costs, including compensation to his attorney, and to Section 733.78, Revised Code, prohibiting any municipal officer or commissioner from having any interest in the expenditure of municipal money, other than his fixed salary. It does not appear that the relator would gain anything personally by the respondents being adjudged to pay the costs and attorney's fee in this case. We are, therefore, of the opinion that this fact does not affect his eligibility to maintain a taxpayer's action. Nor is the fact that he is a member of the park board a disqualification.

Broadly stated, the question presented is whether the Council of the city of Cincinnati is under a mandatory duty to appropriate money collected by taxation to satisfy the budgetary requirements of the Cincinnati Board of Park Commissioners.

More specifically, the question is whether, when the park board has established and maintained a garage and repair shop for years, in which its automotive and other equipment has been housed and repaired, and funds therefor have been appropriated by the council, the council can withhold appropriations, either as a matter of economy or to compel an abandonment of the garage activity by the board, or both, or whether the council must continue to tax and appropriate funds so long as the garage is continued.

There is the secondary question of whether the council can transfer the automotive and other equipment to another department of the city of Cincinnati under the city manager, all without the consent and over the protest of the park board.

By Section 1 of Article II of the Charter of the city of Cin-

cinnati, adopted in 1926, it is provided, that: "All legislative power of the city shall be vested * * * in the council." The power to tax is included in the power to legislate. In 51 American Jurisprudence, 74 and 75, Section 44, it is said:

"Since the power of taxation is a legislative function, it follows that taxes can be imposed, levied, assessed, and collected only under statutory authority * * *."

As the entire legislative power resides in council, the charter thereby makes it the exclusive taxing authority of the municipality. And, by Article VII, the power and the duty to tax are expressly bestowed upon council, and the method and limitations upon the exercise of the power, prescribed so as to conform to state laws passed under the authority reserved in Section 13 of Article XVIII of the Constitution, of municipalities to levy taxes.

At the same time the people conferred legislative power, including the power to tax, upon the council, they continued the existing Board of Park Commissioners by Section 1 of Article VII of the Charter, and provided that "the board shall appoint its employees. The board shall have the control and management of the parks and parkways of the city and may adopt and enforce regulations as to the proper use and protection of park property, and provide penalties for the violation of such regulations. Such regulations shall not take effect until copies thereof are filed with the city solicitor and with the clerk of council. Property under the control of the board shall not be transferred, or used for any but park purposes except with the consent of the board. The board shall have all other powers conferred upon boards of park commissioners by general laws, but council may modify such laws and may designate boulevards, streets and highways in the parks and parkways as part of the public street and road system of the city, and give to the city manager supervision over the construction, repair and maintenance thereof. Such action shall be by ordinance which, unless it is approved by the Board of Park Commissioners, shall require a vote of three-fourths of the members elected to council."

The foregoing constitutes the total power of the Board of Park Commissioners. It will be observed that its powers are strictly limited to parks and parkways. It has no taxing power.

The incorporation by reference to general laws conferring power upon boards of park commissioners requires some comment on the background of municipal government in Ohio, to determine whether the state Legislature can give or take away power from an official of a charter city.

Prior to 1912, the source of all municipal power was the Legislature. The only limitation on the power of the Legislature, imposed by the Constitution of 1851, was that all laws of a general nature were required to have uniform operation, and no special act conferring corporate power should be passed. By 1906, such a complex system of classification had been developed that the Supreme Court struck the system down as unconstitutional, following which the "Municipal Code" was enacted, which was in force when the constitutional amendments of 1912 went into effect. It was a general law under which all Ohio municipal corporations were organized and required to conform.

By the amendments of 1912, the source of municipal power was transferred from the Legislature to the Constitution itself.

By Section 2 of Article XVIII of the Constitution as amended in 1912, it is provided:

"General laws shall be passed to provide for the incorporation and government of cities and villages; and additional laws may also be passed for the government of municipalities adopting the same; but no such additional law shall become operative in any municipality until it shall have been submitted to the electors thereof, and affirmed by a majority of those voting thereon, under regulations to be established by law."

And, by Section 3 of the same Article, it is provided that:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

And, finally, by Section 7 of Article XVIII, it is provided:

"Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of Section 3 of this article, exercise thereunder all powers of local self-government."

The General Assembly, at its first session following the

adoption of Article XVIII of the Constitution, in conformity with the mandate contained in Section 2 of that Article, to assist the people in the exercise of the newly acquired power of local self-government, suggested certain satisfactory forms of municipal structures without, however, attempting to bind the community to follow the suggestion, or of limiting the power conferred by Article XVIII to conceive and adopt any form that might seem advisable to the people thereof. That it was recognized that the General Assembly had no power to impose its will upon any community as to the form of local government was not questioned. Three forms of municipal government—commission, manager, and federal—were suggested, but the right to choose whether any such form should be adopted, or whether the community should continue to operate, or organize, under the existing municipal code amendable by the Legislature, or should adopt an entirely different or even unique form, if the electors thereof so decided, by the method prescribed by the Constitution, that is, by a duly held election for that purpose, was recognized, and the right carefully guarded. A reading of the statute makes this clear. 103 Ohio Laws, 767. The enactment is still a part of the municipal law of Ohio, and is found in Chapter 705 of the Revised Code, which is devoted entirely to laws relating to municipal corporations, applicable to noncharter municipal corporations, organized under Section 7 of Article XVIII of the Constitution.

In *Switzer* v. *State, ex rel. Silvey,* 103 Ohio St., 306, 133 N. E., 552, the Supreme Court was called upon to decide whether the Charter of the city of Dayton, which was adopted under Article XVIII of the Constitution and was not one of the optional forms, could be amended in the method prescribed in 103 Ohio Laws, or whether the method prescribed in Section 9 of Article XVIII was applicable and exclusive. The court held that, as the Charter of the city of Dayton did not conform to any of the statutory optional forms, the provisions for amendment contained in 103 Ohio Laws had no application. At page 312 of the opinion, the court said:

"Dayton having by its own vote, pursuant to the Constitution, adopted a charter form of government, framed by its own commission, of its own choosing, rather than a form or

plan of government framed by the General Assembly, has become a home-rule city, under the *Lynch case, supra* [88 Ohio St., 71], and the statutes of the state of Ohio touching municipal government and powers are therefore not now operative within the city of Dayton.''

Of course, a community may choose to adopt statutory forms and procedures, and the electors of Cincinnati have done so with reference to boards of park commissioners; but such forms and procedures acquire their force and effect within the municipality, not from their enactment by the General Assembly of Ohio, but solely by their adoption by the electors of the city of Cincinnati.

The extent to which state laws are binding in cities that have adopted charters under the ''home rule'' provisions in Article XVIII has been the subject of almost innumerable decisions of the courts, but Section 7 of Article XVIII seems to confer upon any municipality the power to frame and adopt for its government without any limitation whatever as to its form or the distribution of power among its departments. The electors of the community have the option of organizing under any one of the optional statutory forms or any hybrid thereof, or of adopting the old New England ''town meeting'' system, or any conceivable new or old form, provided it is based on the will of the electors, expressed in the manner prescribed in Article XVIII of the Constitution. Or they may choose to remain unincorporated.

It seems that the latest decision of the Supreme Court construing these sections of Article XVIII of the Constitution is that of *State, ex rel. Lynch,* v. *City of Cleveland,* 164 Ohio St., 437, 132 N. E. (2d), 118, in which the question was whether the procedure for the filling of the position of chief of police of the city of Cleveland was that provided by Section 143.34, Revised Code, establishing civil service and requiring that the appointment be made from an eligible list, or whether the city charter provision, providing for appointment without reference to any eligible list, was the proper procedure. It presented a direct conflict between the municipal charter and the state law. As stated in the syllabus, the court held:

''1. Under the provisions of Section 3 of Article XVIII of

the Constitution of Ohio, municipalities have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations as are not in conflict with general laws.

"2. Under those constitutional provisions a municipality is authorized to choose its own method of selecting its own chief of police other than from a civil service eligible list."

We think it is clear that the provisions of the statutes relating to the instrumentalities of municipalities, their departments, and the distribution of power among them and their procedure, are operative in such municipalities only by permission of such municipalities, and when the electors thereof enact municipal provisions that conflict with such statutes, the statutes, and not the municipal provision, must yield. We think that applies to the statutes (Section 755.01 *et seq.*, Revised Code) relating to commissioners of public parks. Those sections are operative in noncharter municipalities and in such charter cities as have made them operative therein. At most, all that can be said is that the Cincinnati charter has adopted those statutory provisions, but they owe their vitality in Cincinnati to that adoption, and have no other or greater effect than they would have had had they been enacted as charter provisions in express terms.

It should be said here that in our view the reference in Section 1 of Article VII of the Cincinnati Charter to "General Laws" is inaccurate if the purpose was to thereby confer upon the Cincinnati Park Board the power conferred by the state Legislature upon park boards in noncharter municipalities. "General Laws," as that phrase is used in Article XVIII of the Constitution, means substantive laws, and does not include laws establishing forms of government and the distribution of power among their agencies. And, of course, they are not "General Laws" within the meaning of Section 3 of Article XVIII, to which ordinances of charter municipalities must conform.

In this connection, relator's counsel cites the recent case of *Village of Beachwood* v. *Board of Elections of Cuyahoga County,* 167 Ohio St., 369, 148 N. E. (2d), 921, in which the court held that statutory provisions on detachment of territory from the village prevailed over a conflicting charter provision. The case

is inapplicable. By Article X of the Constitution, the General Assembly is given the power to provide the method by which the state may be divided into counties and townships for governmental purposes. To permit a municipality to dictate the method of attachment, or detachment of territory to, or from it, would be in direct conflict with this power of the General Assembly. At page 371 *et seq.*, the court said:

"At the outset, it must be borne in mind that a township is a political subdivision of the state. The effect of a successful detachment proceeding is to diminish the boundaries of a municipality and either to enlarge the boundaries of an existing township or to create an entirely new township. The result, therefore, of any detachment proceeding is a change not only in the boundaries of a municipality but also in the boundaries of another political subdivision of the state. Thus, it is clear, that detachment proceedings are not purely local in nature nor do they relate solely to the administration of the internal local affairs of a municipality, but on the contrary they extend beyond its borders since they affect the structure of other political subdivisions of the state.

"Therefore, the detachment of territory from a municipality is not a subject which falls within the sphere of local self-government and to be left to the whims of each municipality, but is a matter which requires the establishment of a uniform procedure throughout the state and is exclusively within the control of the General Assembly.

"This being a matter which falls solely within the power of the General Assembly, the statutes enacted by it are controlling and exclusive."

It is said that the city of Cincinnati has parks outside its territorial boundaries. If so, it holds such property as an owner, subject to the jurisdiction of the political subdivision in which it is located. That fact, if it is a fact, is entirely irrelevant to a decision in this case.

It should be said also that these statutory provisions recognize that park boards have no taxing power, and access to tax money can only be gained through the taxing and appropriating agencies of government. The city charter recognizes this.

We conclude that this controversy must be determined by

the provisions of the Charter of the city of Cincinnati, and by the rules and regulations enacted by the city of Cincinnati under its "home-rule" charter.

We have already quoted the provisions of the charter conferring the taxing power upon the city council. We have quoted the provisions conferring power upon the park board. It will be observed that their functions are entirely distinct, but it will also be observed that the exercise of their respective functions will affect the exercise of the functions of the other. They are both instrumentalities of the same government. And it is assumed by the electorate that their functions will be performed in a spirit of co-operation, and that the only rivalry will be prompted by a desire to serve faithfully and efficiently. If the park board finds it is necessary to have its automotive equipment serviced at the municipal garage because of lack of funds, this is merely incidental, and should be done in this spirit of cooperation.

Now let us consider the facts as shown by the pleadings and the agreed statement of facts, upon which the case was submitted.

At the time of the adoption of its charter by Cincinnati, and, perhaps, for an unspecified time theretofore, the Board of Park Commissioners had under its control and jurisdiction certain personal property, including automotive and other equipment, suitable for use in the maintenance and operation of the parks of the city of Cincinnati, and since the adoption of the charter and the installation of the government thereunder in 1926, the Board of Park Commissioners has continued to have under its control such property.

It is claimed by the respondents that the provisions in the charter, prohibiting the use of property under the control of the park board for any other than park purposes, without the consent of the board, is limited to the real property, and does not apply to personal property, and, therefore, does not limit the power of the city council to transfer the automotive and other equipment to other departments under the city manager. With this construction, we cannot agree. The circumstances negative such a limitation. The park board was an existing and functioning institution at the time. It was contemplated that it

would continue as theretofore. To do so, it was necessary that it have the facilities necessary to keep the park real estate in such condition that it would serve the purpose of a public park. The board could not do this without the necessary tools. How could the board manage or tend the parks without such facilities?

We are of the opinion that all property of the city acquired for park purposes in any manner—by gift, by purchase with tax money, or otherwise—must be managed and controlled by the park board and cannot be used for any other purpose or transferred to any other department without its consent. When property—real or personal—has been acquired for park purposes, whether by gift or purchase, the jurisdiction of the park board attaches, and its sole control and management continues so long as such property is used, or is deemed useful, for park purposes by the park board. Only when the park board concludes the property is no longer of any use for park purposes and consents to relinquish its control can the city council take control, and if council should find that it was not needed for any other municipal purpose, it could dispose of it in the same way that it disposes of any other property that has outlived its usefulness.

To the extent that Ordinance 12-1958 authorizes the assignment of park board automotive and other equipment to any other department of the city, it is beyond the power of the city council and is, therefore, void, as is also Section 3 of the ordinance, purporting to withdraw from the park board authority to operate a garage.

We are, therefore, brought to the ultimate question in this case, which is, whether the council, under the circumstances of this case, must appropriate funds or correct its appropriation ordinance so as to enable the park board to operate its garage to house, store, and repair its automotive and other equipment, as heretofore. In reaching a decision on this question, we deem it unnecessary to consider in detail the relations between the park board and the other departments of the government of Cincinnati. Nor are those stipulations that might reflect upon the motives of the officials. If what has been done, or omitted, is in accordance with law, the motive is immaterial. 11 Ameri-

can Jurisprudence, 818, Section 141. It should be said, however, that no motives have been impugned. And, likewise, any intent other than that disclosed by the ordinances themselves is immaterial.

On December 26, 1957, the Council of the city of Cincinnati passed as an emergency measure an ordinance appropriating from the "General Fund" money to cover the expenses of the various departments, including the park board, for the first three months of 1958. In this ordinance, no provision was made to pay the expense of operating a garage by the park board. Although it is not expressly stated, it seems that the park board had submitted a budget in which it had inserted a certain amount under the code number used to designate the operation of its garage, but the amount appropriated under another code number was increased, and by comparison it is disclosed that the appropriation under the other code number had been increased by the amount that the garage code number had been decreased.

It is stipulated that nothing was appropriated for the operation of the garage by the park board, but that it may, if it desires, use the increase under the other code number to pay the expense of housing and repairing its automotive and other equipment at the municipal garage under the control of the city manager.

The relator prays that the defendant members of the city council be ordered to reconstruct its appropriation ordinance so as to make available to the park board a sum sufficient to pay the expense of operating its garage, either by transferring the amount from the other code number, or by appropriating a like amount from any available source.

It is intimated that this reconstruction can be made on the theory that the amount was placed in the wrong code number by mistake, but this would be a disregard of the facts as shown by the record. The matter was under discussion for many months among the various municipal officials, including members of council, and the ordinance was finally passed over the protest of the park board. It was knowingly and deliberately passed, and we must so consider it.

We quote from the relator's prayer to show the scope of the writ which he seeks:

"Wherefore, relator prays for an alternative writ of mandamus directing the defendants to proceed as follows, or to show cause within a time to be fixed by the court why they should not do so: the defendant members of and as the council of Cincinnati, by appropriate action, to cause to be transferred from Code 4000, current charges, in appropriation ordinance for 1958, No. 490-1957, passed December 26, 1957, to Codes 1000 and 3000, personal services and commodities, Department of Parks; and/or to appropriate adequate sums to said codes from other sources; and also, in any further appropriation ordinances that may be passed, to appropriate adequate sums to these park board codes for the budget of the Department of Parks, all such appropriations to be for the use of the park board for performance of its services in its garages and with its own employees and equipment, as heretofore; and that the other defendants take all proper action to effectuate the foregoing and to set aside the transfer to the municipal garage of equipment and employees belonging exclusively to the park board, and to order same restored to and paid for on approval by the park board, under its sole control and for the purposes only of the park board; * * *"

The balance of the prayer relates to the automotive and other equipment.

From this quotation from the prayer it is made manifest that what the relator seeks to do is to control the council—the legislative body of the municipality—and require it to amend legislation already enacted by it, and to continue in the future to enact similar legislation annually.

We do not believe that is the proper function for a writ of mandamus.

It has long been recognized that in order for the three departments of government to function properly, one should not interfere with either of the others. The separation of powers created by the Constitution requires it. Where the function is legislative in character, the body exercising it will not be enjoined, even though it may contemplate exceeding its authority. *McChord* v. *Louisville & Nashville Rd. Co.*, 183 U. S., 483, at 495, 46 L. Ed., 289, 22 S. Ct., 165. Nor will it be compelled to act by mandamus. 55 Corpus Juris Secundum, 215, Section 130.

In 34 American Jurisprudence, 910, Section 128, it is said:

"At common law the writ of mandamus did not run to Par-liament, and in this country, where the legislative and the judicial departments of the government enjoy an equality, each acting within its own legitimate sphere and independent of the other, and where neither will arrogate to itself control over the other in matters that have been confided to it by the Constitution, mandamus will not lie against members of the Legislature to compel the performance of duties which are purely legislative in character and pertain, therefore, to their legislative functions, over which they have exclusive control, since the courts cannot compel or revise action in this respect without a usurpation of power. The Legislature cannot be thus compelled to pass an act, even though the Constitution expressly .commands it, nor restrained from passing an act, even though the Constitution expressly forbids it."

To issue this writ upon the prayer of the relator, would exalt the Board of Park Commissioners above the council, which, in matters of taxation and appropriation, represents the entire municipality. It would make a part greater than the whole. It would subject the whole to the dictation of its parts, resulting in chaos.

In matters of taxation and appropriation the council is supreme except as limited under Section 13 of Article XVIII of the Constitution, the express charter provisions in favor of the University of Cincinnati and the recreational commission; and over all is the will of the people expressed through the ballot box.

Reference has been made to the fact that certain employees assigned to the park board garage had been transferred to positions in the garage under the city manager, and that is assigned as an interference with the control of the park board. Of course, those employees could not have been transferred against their will. If the situation has developed or should develop where the park board has, or should have, no further duties to be performed at its garage, it would be its duty to dispense with its employees there assigned, and report that fact to the personnel officer; but the status of such employees and their right to continue in the service of the city of Cincinnati would depend upon the application of civil service or other rules. Assigning them

to other departments would in no sense be an interference with the management and control of the parks by the park board.

Our conclusion is that the prayer of the relator for a writ against the members of the council should be, and it is hereby, denied, and that the writ against the defendants, who are administrative officers of the city of Cincinnati, should be awarded, commanding them to observe and comply with the directions of the Board of Park Commissioners as to the disposition of the automotive and other equipment which has been heretofore placed in the custody of the board and is now in its custody.

*Judgment accordingly.*

HILDEBRANT, P. J., and LONG, J., concur.

(Decided April 29, 1958.)

ON SUPPLEMENTARY HEARING.

MATTHEWS, J. The discussion on the hearing to settle the terms of the decree based on the original opinion handed down in this case caused the court to conclude that another hearing should take place limited to a consideration of what was referred to in that opinion as the "Secondary Question." Accordingly, the court caused counsel to be notified that a further hearing would be had on the designated day, limited, however, to "an inquiry as to whether there is any evidence at present before the court that prior to or during the pendency of this action, the defendants or any of them had claimed the right to control the automotive or other equipment of the park board, contrary to the order of that board.

"At this hearing, if either party desires to introduce any further evidence on that subject, the court will hear it."

At the hearing, the relator called the superintendent of the park board as a witness, and the respondents placed the superintendent of the municipal garage on the witness stand, and each testified rather fully as to the handling of the automotive and other equipment of the park board prior to and during the pendency of this action.

From this testimony we think it was clearly established that at no time either before or during the pendency of this action did any officer or employee in the department under the City Manager, or any respondent hereto question the authority of the park board over its automotive or other equipment, or refuse or threaten to deliver or dispose of it contrary to the direction of said park board, or assign any part of it to any other department of the city government, or threaten so to do.

Since the first of this year some of the automotive equipment has been placed in the custody of the Municipal Garage for repair. The repairs have been made and the equipment, in all instances, is held subject to the order of the park board, all in accordance with the agreement with the park board. There was testimony that the paint on one vehicle was changed from blue to yellow, and the legend thereon changed from "Park Board" to "Park Department." There was no evidence that the park board gave any specific instructions as to the color or legend, and no evidence that the Municipal Garage was requested to make a change back to the original color. And, certainly, that incident is no evidence that the Municipal Garage, or its personnel, questioned the authority of the park board over its equipment.

In 25 Ohio Jurisprudence, 1199, Section 271, it is said:

"In a proceeding by mandamus to compel an officer to do an act which it is claimed the law enjoins on him as a duty, the existence of all the facts necessary to put him in default must be shown. If it is a case requiring a demand and refusal, such fact must be shown.

"The relator in a mandamus proceeding is bound to show the violation of some statutory duty on the part of the respondent, or, a dereliction of duty. In other words, the burden of showing a clear right to relief is on the relator."

We find that there is a failure of proof that any respondent herein has refused to comply with any order relating to park board automotive or other equipment, or has questioned its jurisdiction over the same.

It follows that the relator has failed to sustain the burden of proving that he is entitled to a writ of mandamus, as prayed for.

For the reasons stated in the original opinion and this supplemental opinion, the action will be, and hereby is, dismissed at relator's costs.

*Petition dismissed.*

HILDEBRANT, P. J., and LONG, J., concur.