BUCKEYE COMMUNITY HOPE FOUNDATION ET AL., APPELLANTS,
*v.* CITY OF CUYAHOGA FALLS ET AL., APPELLEES.

[Cite as *Buckeye Community Hope Found. v. Cuyahoga Falls* (1998), 82 Ohio St.3d 539.]

(No. 97–137—Submitted January 14, 1998—Decided
May 6, 1998—Reconsideration Granted and
Judgment Reversed July 16, 1998.)

540

*Zeiger & Carpenter, John W. Zeiger, Jeffrey A. Lipps* and *Michael N. Beekhuizen; McFarland Law Office* and *J. Drew McFarland,* for appellants.

MOYER, C.J.  This court has invoked the reconsideration procedures set forth in S.Ct.Prac.R. XI to "correct decisions which, upon reflection, are deemed to have been made in error." *State ex rel. Huebner v. W. Jefferson Village Council* (1995), 75 Ohio St.3d 381, 383, 662 N.E.2d 339, 341.  For the reasons that follow, we grant the appellants' motion for reconsideration and reverse the judgment of the court of appeals.

## I

Section 3, Article XVIII of the Ohio Constitution grants powers of local self-government to municipalities by providing, "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."  In exercising those powers, municipalities may choose to govern themselves by charter in accordance with Section 7, Article XVIII of the Ohio Constitution:  "Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government."

It is well settled that although the Ohio Constitution grants broad powers of local self-government to municipalities, the scope of those powers is not without limits.  In *Canton v. Whitman* (1975), 44 Ohio St.2d 62, 73 O.O.2d 285, 337 N.E.2d 766, this court interpreted Section 3, Article XVIII as follows:  "This section, adopted in 1912, preserved the supremacy of the state in matters of 'police, sanitary and other similar regulations,' while granting municipalities sovereignty in matters of local self-government, *limited only by other constitutional provisions.*"  (Emphasis added.)  *Id.* at 65, 73 O.O.2d at 287, 337 N.E.2d at 769.  See, also, *State ex rel. Bedford v. Cuyahoga Cty. Bd. of Elections* (1991), 62 Ohio St.3d 17, 20, 577 N.E.2d 645, 647.

In *Bazell v. Cincinnati* (1968), 13 Ohio St.2d 63, 42 O.O.2d 137, 233 N.E.2d 864, paragraph one of the syllabus, we articulated the limits of charter government by stating that "a charter city has all powers of local self-government *except to the*

*extent that those powers are taken from it or limited by other provisions of the Constitution* or by statutory limitations on the powers of the municipality which the Constitution has authorized the General Assembly to impose." (Emphasis added.) More recently, we stated that "[a] municipality that chooses to adopt a charter does so in order to manage its own purely local affairs without interference from the state, *with the understanding that these local laws will not conflict with the Constitution and general laws.*" (Emphasis added.) *Rispo Realty & Dev. Co. v. Parma* (1990), 55 Ohio St.3d 101, 102, 564 N.E.2d 425, 426–427.

The City Charter of Cuyahoga Falls provides that voters may exercise powers of referendum on any ordinance or resolution passed by the city council. The appellants contend that this provision conflicts with Section 1f, Article II of the Constitution, which provides, "The initiative and referendum powers are hereby reserved to the people of each municipality on all questions which such municipalities may now or hereafter be authorized by law to control by legislative action; such powers may be exercised in the manner now or hereafter provided by law."

Words used in the Constitution are construed according to their usual or customary meaning. See *State ex rel. Herman v. Klopfleisch* (1995), 72 Ohio St.3d 581, 584, 651 N.E.2d 995, 998; R.C. 1.42. Section 1f, Article II reserves referendum powers to the people of "each municipality." Those words are unambiguous. There is no distinction between charter municipalities and municipalities that have no charter. Additionally, Section 1f, Article II is the sole constitutional source of initiative and referendum powers, reserved by the people of the state to the people of each municipality.

Section 1f, Article II provides initiative and referendum powers only on those questions that municipalities "may now or hereafter be authorized by law to control by legislative action." We have interpreted this phrase to exclude, from referendum proceedings, administrative actions taken by a city council.[1] In *Myers v. Schiering* (1971), 27 Ohio St.2d 11, 56 O.O.2d 6, 271 N.E.2d 864, we held that "[u]nder Section 1f of Article II of the Ohio Constitution, municipal referendum powers are limited to questions which municipalities are 'authorized by law to control by legislative action.'" *Myers* at paragraph one of the syllabus. There, we determined that the passage of a resolution "granting a permit for the operation of a sanitary landfill, pursuant to an existing zoning regulation, constitutes administrative action and is not subject to referendum proceedings." *Id.* at paragraph two of the syllabus. See, also, *State ex rel. Srovnal v. Linton* (1976), 46 Ohio St.2d 207, 75 O.O.2d 241, 346 N.E.2d 764.

---

1. As a municipal legislative body, city councils may act in an administrative capacity. *Donnelly v. Fairview Park* (1968), 13 Ohio St.2d 1, 42 O.O.2d 1, 233 N.E.2d 500, paragraph one of the syllabus.

The prior majority opinion in this case determined that both *Myers* and *Srovnal* were inapposite because neither case presented an issue regarding referendum powers granted by charter. That conclusion was not correct.

The prior majority opinion reasoned that because Section 1f, Article II is not a self-executing provision, charter municipalities enacting ancillary legislation to carry out the principles enunciated in Section 1f, Article II were not restricted to following the statutory initiative and referendum procedures enacted by the General Assembly for non-charter municipalities. *Buckeye Hope*, 81 Ohio St.3d at 565–566, 692 N.E.2d at 1001–1002. The prior majority opinion then concluded that by virtue of Section 7, Article XVIII, charter municipalities were not limited by Section 1f, Article II to providing referendum powers only for actions legislative in nature. *Id.* at 566, 692 N.E.2d at 1002.

It is true that charter municipalities, in providing for referendum and initiative powers, are not restricted to the statutory mechanisms for initiative and referendum proceedings that govern non-charter municipalities. Charter provisions may be more restrictive, or less restrictive than those statutory procedures pursuant to the power of local self-government granted by the people under Sections 3 and 7 of Article XVIII, as the prior majority opinion noted. *Id.* at 565–566, 692 N.E.2d at 1001–1002. However, both the statutory procedures enacted by the General Assembly to carry into effect Section 1f, Article II, and provisions enacted by charter municipalities to do the same, must be consistent with the specific powers granted by Section 1f, Article II, since it is the sole constitutional source for referendum and initiative powers. Otherwise, the meaning of any constitutional provision that is not self-executing, and therefore requires ancillary legislation, could be altered by the words of the legislation carrying the provision into effect.

Accordingly, there is no persuasive reason to deviate from our well-established case law as stated in *Myers* and *Srovnal.* Section 1f, Article II clearly limits referendum and initiative powers to questions that are legislative in nature. Charter municipalities are subject to this limitation, as the powers of local self-government granted pursuant to Sections 3 and 7 of Article XVIII are subject to the limitations of other provisions of the Constitution. See *Bazell,* at paragraph one of the syllabus, and *Whitman,* 44 Ohio St.2d at 65, 73 O.O.2d at 287, 337 N.E.2d at 769.

The section of the Charter of Cuyahoga Falls providing that voters may exercise powers of referendum on any ordinance or resolution passed by the city council is constitutionally invalid. Voters of Cuyahoga Falls may exercise powers of referendum on any ordinance or resolution that constitutes legislative action. Section 1f, Article II does not authorize the residents of Cuyahoga Falls to initiate referendum proceedings on an action taken by the city council that is not

legislative in nature. Section 1f, Article II permits initiative and referendum powers only on those matters that constitute legislative action.

Therefore, we hold that the citizens of a municipality may not exercise powers of referendum, by charter or other means, greater than those powers granted by Section 1f, Article II of the Ohio Constitution.

## II

The remaining question for our determination is whether the approval of the site plan by the city council constituted administrative or legislative action.

The city argued that the approval of the site plan was a legislative action because the action was taken by adopting an ordinance. In support of its position, the city cited *Donnelly v. Fairview Park* (1968), 13 Ohio St.2d 1, 42 O.O.2d 1, 233 N.E.2d 500, paragraph two of the syllabus, which states that "[t]he test for determining whether the action of a legislative body is legislative or administrative is whether the action taken is one enacting a law, ordinance or regulation, or executing or administering a law, ordinance or regulation already in existence."

The question presented to this court in *Donnelly* was whether the action of a city council in failing to approve the recommendation of the city's planning commission for a resubdivision of a parcel of real estate constituted legislative or administrative action. *Id.* at 3, 42 O.O.2d at 2, 233 N.E.2d at 501. This court determined that the action was administrative. *Id.* at 4, 42 O.O.2d at 3, 233 N.E.2d at 502. In arriving at that conclusion, the court stated, " 'The crucial test for determining that which is legislative from that which is administrative or executive is whether the action taken was one already making a law, or executing or administering a law already in existence.' * * * If, then, the action of a legislative body *creates a law, that action is legislative, but if the action of that body consists of executing an existing law, the action is administrative.*" (Emphasis added.) *Id.* at 4, 42 O.O.2d at 2–3, 233 N.E.2d at 502, citing *Kelley v. John* (1956), 162 Neb. 319, 321, 75 N.W.2d 713, 715. Therefore, paragraph two of the syllabus in *Donnelly* established that the test requires an examination of the nature of the action taken, rather than the mere form in which it is taken.[2] Accordingly, the city's position that the approval of the site plan was a legislative action because the council took action via an ordinance (rather than by resolution or other means) is in error.

Additionally, the city argued that the ordinance approving the site plan constituted legislative action because city law stated that decisions made by the

---

2. The quoted language in the text of *Donnelly* is instructive in determining the meaning of paragraph two of the syllabus because paragraph two itself is not stated within the text.

city council relating to approvals of site plans "shall be considered as legislative rather than administrative actions." Cuyahoga Falls Zoning Ordinance No. 1171.03(c). This argument also is without merit. The city council cannot designate an action as legislative simply because it desires the action to be legislative. *Donnelly* requires that the nature of the action taken determines whether it is legislative or administrative, *i.e.*, whether the action creates or establishes law, or whether the action merely applies existing law to a given situation. *Donnelly* at 4, 42 O.O.2d at 2, 233 N.E.2d at 502. Additionally, it is our constitutional duty, in interpreting the words of Section 1f, Article II, to independently analyze whether the action by the city is a legislative action.

The action taken by the city council here was clearly administrative in nature. Ordinance No. 48–1996 passed by the city council approved a plan for the "development of land * * * in accordance with such district and zoning regulations as stipulated in the Codified Ordinances of the City of Cuyahoga Falls and as approved by the Planning Commission * * *." The ordinance merely approves the planning commission's application of existing zoning regulations to the plan submitted by the appellants. The ordinance has no general, prospective application such that the action taken would fit within the usual and customary meaning of the phrase "legislative action" contained in Section 1f, Article II. See Black's Law Dictionary (6 Ed.1990) 899 (defining "legislative act" as "[l]aw * * * passed by legislature in contrast to court-made law. One which prescribes what the law shall be in future cases arising under its provisions."). Rather, the city council determined the rights of the appellants by applying existing law to the site plan submitted by the appellants. Accordingly, adoption of Ordinance No. 48–1996 was an administrative act, and therefore was not a legislative action that could be subjected to referendum proceedings pursuant to Section 1f, Article II.

Therefore, we hold that pursuant to Section 1f, Article II of the Ohio Constitution, actions taken by a municipal legislative body, whether by ordinance, resolution, or other means, that constitute administrative action, are not subject to referendum proceedings. The passage by a city council of an ordinance approving a site plan for the development of land, pursuant to existing zoning and other applicable regulations, constitutes administrative action and is not subject to referendum proceedings.

Pursuant to S.Ct.Prac.R. XI, the timely filing of a motion for reconsideration temporarily prevents the issuance of a mandate in accordance with the court's judgment. A timely motion was filed in this cause. Thus, this court has not yet issued a mandate in this action to implement our opinion rendered on May 6, 1998, and reported at 81 Ohio St.3d 559, 692 N.E.2d 997. Under S.Ct.Prac.R. XI(3)(A)(2), where a timely filed motion for reconsideration is granted, a mandate shall issue at the time the Supreme Court's judgment entry on reconsideration is

entered. In accordance with our grant of the motion for reconsideration today, a mandate implementing this opinion shall also issue today.

For the foregoing reasons, we grant the motion for reconsideration and reverse the judgment of the court of appeals.[3]

*Reconsideration granted
and judgment reversed.*

PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

LUNDBERG STRATTON, J., concurs separately.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., dissent.

---

LUNDBERG STRATTON, J., concurring. As the justice who changed her vote on an opinion that has already been published, I feel obliged to explain my decision to reconsider and to join the former dissenters in issuing a new majority opinion.

As a trial judge, issues before me were frequently clear, easy to resolve, and more black and white (though certainly not always). However, when a case reaches the Supreme Court, the black and white issues have often been resolved by settlement, fallen by the wayside, or have been resolved by the lower courts by established precedent, case law, or statute. More frequently, the issues we accept for full consideration upon the allowance of a discretionary appeal are now gray—what did the drafters of the United States or the Ohio Constitutions mean by this broad language we must apply to this narrow fact pattern or to this twentieth century technology issue? What did the legislature intend by this confusing statute? Did the legislature even think that the statute would ever be applied as the parties now contend it should be? Who is right—the three very experienced appellate court districts who believe this new law is constitutional or the four other equally learned and respected appellate districts who strongly disagree? Does the court or the General Assembly decide public policy? What if public policy is overriding the constitutional rights of a minority? These are tough issues we struggle with daily, seeking that correct interpretation, that fine balancing of rights. I constantly challenge myself as to whether this is the "right" decision or whether I have reached it because my own judicial philosophy colors my outlook. Am I being an activist or deferring too much to the legislature? There are no simple answers.

---

3. Our earlier opinion, including paragraphs one and two of the syllabus, as reported at 81 Ohio St.3d 559, 692 N.E.2d 997, is hereby nullified in all respects by virtue of our decision today, and thus has no controlling authority.

Into this difficult mix comes *Buckeye Community Hope Found. v. Cuyahoga Falls*—that all-too-complex clash between two groups—the developer seeking to move forward on an unpopular but worthy project opposed by the homeowners who do not want that project "in their backyard." Both sides have valid, strong legal and emotional arguments; both firmly believe in their cause; both look to us to finally resolve the conflict.

I voted with the majority in *Buckeye Community Hope Found. v. Cuyahoga Falls* (1998), 81 Ohio St.3d 559, 692 N.E.2d 997, because I passionately believe in the rights of the voter. It is the cornerstone of our system of justice.

I grew up in three foreign countries as a daughter of American missionaries. I was born in Thailand and attended boarding schools in South Viet Nam and Malaysia. I saw countries governed by military dictators, by monarchs, by anarchy, and by communists. I came from the outside to this country, where the right to vote, though not always exercised, is one of its most cherished foundations, the basis of its representative form of government. The openness of our government, and the power of our vote to determine who represents us in our government, cannot be fully appreciated until one has lived in countries that do not have those privileges.

Therefore, when I considered the first majority opinion, it seemed the right decision. The *people* should have the ultimate right to decide their own fate, to be the final arbiters of their community's course. The majority's argument was powerful that Home Rule allowed a chartered municipality to grant its voters the final say. That is the strength of our system.

But I forgot in my zeal to affirm the power of the vote that our forefathers carefully fashioned some checks and balances that are equally a cornerstone to our system. Our system of three equal branches, which balance and check each other, does not exist in many other countries, where the legislature or the courts are merely puppets of the executive branch. Yet, to allow any of the three branches to become more powerful than the other two is to create instability in our system. Underlying the three branches is the right to vote, sometimes direct and sometimes representative. The crafters of our Constitution recognized that sometimes our representatives need some distance from the voting so that they can make a decision that may not be popular at the moment, but may be best or right in the long haul. Thus, state representatives have close accountability with two-year terms, senators are more insulated by four-year terms, and the judiciary by six-year terms—still accountable but with greater freedom to act as necessary though it may not be popular.

But predictability and stability are also important to the survival of our system. A mere change of our President cannot wipe out decades of law and statutes, as happens in many countries. The legislature acts as the check against the

arbitrary changes of the administrative branch; the courts as a check against both. Homeowners must be secure in the knowledge that their deed to their home will survive the election; businesses must be able to rely on the stability of contracts, zoning laws, tax laws, and laws governing relationships, whether their business is to build factories or to operate a beauty salon. The loss of stability can result in chaos.

In reconsidering *Buckeye Community Hope Found.,* and in weighing all of those heavy thoughts and constitutional issues, about which volumes have been written, I now join the new majority because I believe it has arrived at the right analysis; I now believe my former view was wrong. I see now that the framers of the Ohio Constitution had a good reason for Section 1f, Article II, in limiting the referendum to legislative decisions only. But to apply the referendum to everyday administrative decisions, even if the charter of the municipality so allows (and I am no longer convinced this is what the drafters of the charter intended), is to submit the minutiae of everyday administrative decision-making to the whim of the voter at the moment. The unpopular development, the disfavored contract with a school·principal, the neighbor's new garage approval, or any other decision could be subject to voter disapproval if an angered voter was organized or well-funded enough. Chaos and instability could result. The decisions made by homeowners, developers, schools, or anyone else could no longer depend on established zoning approvals or contracts made—all could be thrown out at whim.

The law of unintended consequences is "the idea that whenever society takes action to change something, there will be unanticipated or unintended effects." Fortune, Aug., 1996. Sometimes legislative action results in unintentional consequences. Sometimes our actions do also. We make a decision that seems right, constitutional, and just at the time, but cannot always foresee how it can apply in ways we never intended. I now see the danger of my original vote and the wisdom of the original framers of our Constitution in limiting referendums to legislative actions and in not allowing municipalities to exercise powers greater than the Constitution grants. In this case, Section 1f, Article II trumps the Home Rule Amendment. I believe this is what the Constitution intends. I now so vote accordingly.

———

**DOUGLAS, J., dissenting.** I dissent from the judgment and opinion of the majority. Subsequent to our May 6, 1998 decision in *Buckeye Community Hope Found. v. Cuyahoga Falls* (1998), 81 Ohio St.3d 559, 692 N.E.2d 997, appellants filed a motion for reconsideration. However, in granting appellants' motion, the majority has clearly disregarded the requirements of S.Ct.Prac.R. XI. Section 2

of S.Ct.Prac.R. XI provides that a motion for reconsideration shall be confined strictly to the grounds urged for reconsideration and that the motion "shall not constitute a reargument of the case." Appellants' motion is premised upon essentially the same arguments that were initially presented to this court. In fact, the motion contains absolutely nothing that warrants a change from our original decision. The majority, however, in rehearing the cause for whatever undisclosed reasons, has conveniently ignored the requirements of S.Ct.Prac.R. XI. Oh well, so much for the rules!

In any event, I also dissent from the judgment and the opinion of the majority because I cannot agree with the majority's severe restriction of the sacrosanct right of referendum. What is particularly disturbing is that the majority completely ignores the clear wording of the drafters of Section 1f, Article II and turns the *enabling* provision into an affirmative limitation on the right of referendum. I continue to believe that our original decision in *Buckeye* is correct, is supported by law, and, most importantly, reflects the fundamental precepts upon which our state and country are based. In that regard it is interesting to recall, during this time of the year, July 4, when we celebrate the founding of our country and our Declaration of Independence, that that sacred document contains the words "[t]hat to secure these rights, Governments are instituted among Men, *deriving their just powers from the consent of the governed."* (Emphasis added.) Today, the majority tells the citizens of Cuyahoga Falls, and all other communities and citizens likely situated, that what they have voted into their charters means nothing because if the charter provision in question here can be negated by the waving of the four-vote magic wand, then no charter provision is truly sacred. So much for "just powers" being derived "from the consent of the governed." Given today's holding, Section 2, Article I of the Ohio Constitution should now read that "[a]ll political power is [no longer] inherent in the people."

Finally, this case is *not* about missionaries, separation of powers, length of terms of office, the President, or a "disfavored contract with a school principal." This case *is* about Home Rule Charters voted into existence by electors in municipalities all across this state having nothing to do, of course, with the parade of horribles assembled in the concurring opinion. The citizens of a municipality have the authority to establish the means and methods to govern their own affairs.

Accordingly, I dissent. I would deny the motion for reconsideration and follow our decision reported in 81 Ohio St.3d 559, 692 N.E.2d 997, which affirmed the well-reasoned judgment of the court of appeals.

RESNICK and F.E. SWEENEY, JJ., concur in the foregoing dissenting opinion.