**[This opinion has been published in *Ohio Official Reports* at 81 Ohio St.3d 559.]**

BUCKEYE COMMUNITY HOPE FOUNDATION ET AL., APPELLANTS, *v*. CITY OF CUYAHOGA FALLS ET AL., APPELLEES.

[Cite as *Buckeye Community Hope Found. v. Cuyahoga Falls*, 1998-Ohio-189.]

*Municipal corporations—Sections 3 and 7, Article XVIII of the Ohio Constitution confer upon municipalities the authority "to exercise all powers of local self-government"—People of municipality may, by charter, reserve to themselves the power to approve, or reject, by popular vote, any actions of city council.*

1.   Sections 3 and 7, Article XVIII of the Ohio Constitution confer upon municipalities the authority "to exercise all powers of local self-government." Section 1f, Article II of the Ohio Constitution does not limit that authority.

2.   In accordance with Sections 3 and 7, Article XVIII of the Ohio Constitution, the people of a municipality may, by charter, reserve to themselves the power to approve or reject, by popular vote, any actions of city council regardless of whether such actions are administrative or legislative in nature.

(No. 97-137—Submitted January 14, 1998—Decided May 6, 1998.)

APPEAL from the Court of Appeals for Summit County, No. 17933.

―――――――――――

{¶ 1} The facts giving rise to this appeal are not in dispute. Appellant Buckeye Community Hope Foundation ("Buckeye Hope") is a nonprofit corporation that develops housing for individuals through the use of low-income housing tax credits. Buckeye Hope is affiliated with Cuyahoga Housing Partners, Inc. and Buckeye Community Three L.P. ("Buckeye Three"), also appellants herein.

**{¶ 2}** On June 12, 1995, Buckeye Three purchased a parcel of land located within the appellee city of Cuyahoga Falls. Appellants intended to construct a seventy-two-unit apartment complex on the parcel. At the time of purchase, the land was zoned for multifamily use. A site plan regarding the proposed development was submitted to the Cuyahoga Falls Planning Commission, which, on February 21, 1996, recommended that the project be approved. Thereafter, in accordance with the Cuyahoga Falls City Charter, the site plan was then submitted to the appellee Cuyahoga Falls City Council for its approval.

**{¶ 3}** On April 1, 1996, city council accepted the recommendation of the planning commission and passed Ordinance No. 48-1996. In Section 1 of the ordinance, council stated, "That this City Council approves the plan for development of land situated in an R-17 Medium Density Multiple Family zoning district in accordance with such district and zoning regulations as stipulated in the Codified Ordinances of the City of Cuyahoga Falls and as approved by the Planning Commission as per the plans and stipulations contained in Planning Commission File P-6-96-SP."

**{¶ 4}** Subsequently, referendum petitions were filed with the appellee Cuyahoga Falls Clerk of Council challenging the passage of the ordinance. The petitions were then forwarded to the appellee Summit County Board of Elections. The board of elections determined that the petitions contained a sufficient number of valid signatures.

**{¶ 5}** In an attempt to keep the referendum off the November 1996 ballot, appellants, on May 1, 1996, filed a complaint against appellees in the Court of Common Pleas of Summit County. Appellants sought to enjoin appellees from taking any further action regarding the referendum process. Appellants also requested a judicial determination that, because the passage of the ordinance constituted merely administrative as opposed to legislative action by council, the ordinance was not subject to challenge by way of referendum. Appellants claimed

that Section 1f, Article II of the Ohio Constitution prohibited a referendum on actions taken by a municipal legislative body that were administrative in nature.

{¶ 6} The trial court conducted a hearing with respect to appellants' request for injunctive relief. On May 31, 1996, the court ruled in favor of appellees, denying appellants' request for a preliminary or permanent injunction. The court held that the classification of action taken by council in passing Ordinance No. 48-1996, whether administrative or legislative in character, was not dispositive of whether the ordinance could be submitted to a vote of the electors. Rather, the court determined that the ordinance could be voted on because the citizens of Cuyahoga Falls had specifically reserved to themselves such a right under their charter.

{¶ 7} Appellants appealed the trial court's decision to the Court of Appeals for Summit County. On December 18, 1996, the court of appeals affirmed the judgment of the trial court.

{¶ 8} The cause is now before this court upon the allowance of a discretionary appeal.

_____

*Zeiger & Carpenter*, *John W. Zeiger*, *Jeffrey A. Lipps* and *Michael N. Beekhuizen; McFarland Law Office* and *J. Drew McFarland*, for appellants.

*Virgil Arrington, Jr*., Cuyahoga Falls Deputy Law Director, for appellees city of Cuyahoga Falls, Cuyahoga Falls City Council, and Cuyahoga Falls Clerk of Council.

*Maureen O'Connor*, Summit County Prosecuting Attorney, and *William E. Schultz*, Assistant Prosecuting Attorney, for appellee Summit County Board of Elections.

*Malcolm C. Douglas*, urging affirmance for *amicus curiae,* South Solon Homeowners Association, Inc.

*Roger Gupta*, *pro se*, urging affirmance for *amicus curiae*, Dr. Roger Gupta, Emeritus Professor, Kent State University.

*Walter & Haverfield P.L.L.*, *Charles T. Riehl* and *Fredrick W. Whatley*, urging reversal for *amicus curiae*, Cuyahoga County Law Directors Association.

*Fair Housing Law Clinic*, *Edward G. Kramer*, *Diane E. Citrino* and *Kathy J. Grey; Porter, Wright, Morris & Arthur* and *Robert D. Anderle*, urging reversal for *amicus curiae*, Coalition on Homelessness and Housing in Ohio.

_____

**DOUGLAS, J.**

{¶ 9} The trial court and court of appeals determined that the citizens of Cuyahoga Falls were entitled, by virtue of their city charter, to vote on the passage of Ordinance No. 48-1996. We agree. Accordingly, we affirm the judgment of the court of appeals.

{¶ 10} Cuyahoga Falls, as a charter municipality, derives its sovereign power from Article XVIII of the Ohio Constitution. Before 1912, the time of the adoption of Article XVIII, municipalities could exercise only those powers delegated to them by the General Assembly. *Geauga Cty. Bd. of Commrs. v. Munn Rd. Sand & Gravel* (1993), 67 Ohio St.3d 579, 582, 621 N.E.2d 696, 699. With the adoption of Article XVIII, municipalities were given the power to control matters of local concern. In *Perrysburg v. Ridgway* (1923), 108 Ohio St. 245, 255, 140 N.E. 595, 598, the court discussed the underpinnings for the adoption of Article XVIII, and stated:

"Prior to 1912 there was no express delegation of power to municipalities in the Ohio Constitution. Under the decisions of our courts, it had been held again and again * * * that municipal power was delegated only by virtue of a statute. Therefore, municipalities of the state, especially the larger ones, were continually at the door of Ohio's General Assembly asking for additional political power for municipalities, or modifications in some form of previous delegations of such power. Such power, being legislative only, could be withdrawn from the municipalities, or amended, at any session of the Legislature.

4

"Municipalities were, therefore, largely a political football for each succeeding Legislature, and there was neither stability of law, touching municipal power, nor sufficient elasticity of law to meet changed and changing municipal conditions.  To the sovereign people of Ohio the municipalities appealed in the constitutional convention of 1912, and the Eighteenth Amendment, then known as the 'Home Rule' Amendment, was for the first time adopted as part of the Constitution of Ohio, *wherein the sovereign people of the state expressly delegated to the sovereign people of the municipalities of the state full and complete political power in all matters of 'local self-government.'* "  (Emphasis added and citation omitted.)

{¶ 11} Section 7 of Article XVIII provides that "[a]ny municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, *exercise thereunder all powers of local self-government*."  (Emphasis added.)  Section 3 of Article XVIII empowers municipalities "*to exercise all powers of local self-government* and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."  (Emphasis added.)

{¶ 12} Further, Section 7, Article XVIII "confers power on the municipality to frame and adopt a charter for its government, and to *exercise thereunder* all powers of local self-government as provided by section 3.  That is, the people of the municipality are given the power to construct the machinery of their own local government and to operate it themselves."  (Emphasis *sic*.)  *Froelich v. Cleveland* (1919), 99 Ohio St. 376, 390-391, 124 N.E. 212, 216.  See, also, *State ex rel. Hackley v. Edmonds* (1948), 150 Ohio St. 203, 212, 37 O.O. 474, 477, 80 N.E.2d 769, 773 ("It would seem from reading the debates that the Constitutional Convention desired to submit to the electorate of this state amendments to the Constitution to give to municipalities, and particularly to those which adopt charters, the broadest possible powers of self-government in connection with all

matters which are strictly local and do not impinge upon matters which are of a state-wide nature or interest.").

{¶ 13} The words "as are not in conflict with general laws," found in Section 3, Article XVIII, apply only to a city's power to adopt "local police, sanitary and other similar regulations," but not its power to enact laws for "local self-government." See *Rispo Realty & Dev. Co. v. Parma* (1990), 55 Ohio St.3d 101, 103, 564 N.E.2d 425, 427, citing *State ex rel. Canada v. Phillips* (1958), 168 Ohio St. 191, 5 O.O.2d 481, 151 N.E.2d 722, paragraph four of the syllabus. See, also, *Dies Elec. Co*. v. *Akron* (1980), 62 Ohio St.2d 322, 325, 16 O.O.3d 365, 367, 405 N.E.2d 1026, 1028. Additionally, "[b]y reason of Sections 3 and 7 of Article XVIII of the Ohio Constitution, a charter city has all powers of local self-government except to the extent that those powers are taken from it or limited by other provisions of the Constitution or by statutory limitations on the powers of the municipality which the Constitution has authorized the General Assembly to impose." *Bazell v. Cincinnati* (1968), 13 Ohio St.2d 63, 42 O.O.2d 137, 233 N.E.2d 864, paragraph one of the syllabus.

{¶ 14} Pursuant to Section 7, Article XVIII of the Ohio Constitution, the people of Cuyahoga Falls enacted a charter to govern their local affairs. To that end, Section 2, Article IX of the charter provides that "[t]he electors shall have the power to approve or reject at the polls *any ordinance or resolution* passed by the Council, except as hereinafter provided." (Emphasis added.) In this regard, the people of Cuyahoga Falls reserved to themselves the power to deal directly with and challenge, by referendum, certain actions taken by council. Indeed, such a reservation of power is clearly a matter embraced within the field of local self-government. *Dillon v. Cleveland* (1927), 117 Ohio St. 258, 273-274, 158 N.E. 606, 611. See, also, *State ex rel. Bedford v. Cuyahoga Cty. Bd. of Elections* (1991), 62 Ohio St.3d 17, 19, 577 N.E.2d 645, 647, citing *Fitzgerald v. Cleveland* (1913), 88 Ohio St. 338, 347, 103 N.E. 512, 514 (" 'It is clear upon reason and authority that

municipal elections are and should be regarded as affairs relating to the municipality itself, and, in the absence of fundamental limitations prohibiting, are things that may be provided for by the local government. * * *' Accord *Reutener v. Cleveland* [1923], 107 Ohio St. 117, 133, 141 N.E. 27, 31.").

{¶ 15} Appellants contend that referendum powers reserved in a municipal charter are not absolute and are expressly limited by Section 1f, Article II of the Ohio Constitution. Section 1f, Article II provides:

"The initiative and referendum powers are hereby reserved to the people of each municipality on all questions which such municipalities may now or hereafter be authorized by law to control by legislative action; such powers shall be exercised in the manner now or hereafter provided by law."

{¶ 16} Specifically, appellants contend that the language "authorized by law to control by legislative action," as used in Section 1f, Article II, is one of limitation, restricting the right of referendum to only those actions of council that are purely legislative in nature. Therefore, appellants argue that, because the passage of Ordinance No. 48-1996 constituted merely administrative action by council, the trial court and court of appeals erred in determining that the ordinance could properly be submitted to a referendum vote under the charter.

{¶ 17} We agree with appellants that the action of council in approving the site plan was essentially administrative in nature. See *Donnelly v. Fairview Park* (1968), 13 Ohio St.2d 1, 42 O.O.2d 1, 233 N.E.2d 500, paragraph one of the syllabus ("A public body essentially legislative in character may act in an administrative capacity."). It appears that appellants were at all times in compliance with city zoning laws regarding the proposed development. Further, the action of council in approving the site plan consisted, generally, of executing and administering a zoning law previously enacted. See *Myers v. Schiering* (1971), 27 Ohio St.2d 11, 56 O.O.2d 6, 271 N.E.2d 864, and *State ex rel. Srovnal v. Linton* (1976), 46 Ohio St.2d 207, 75 O.O.2d 241, 346 N.E.2d 764. However, we disagree

with appellants that the citizens of Cuyahoga Falls are prohibited by Section 1f, Article II from voting on the passage of Ordinance No. 48-1996.

{¶ 18} In this case, the court of appeals determined that Section 1f, Article II should not be interpreted as a limitation upon referendum powers reserved in a municipal charter. Specifically, the court held that "[w]hile this section does establish that the people of Ohio reserved to themselves a right of referendum, we do not find this language was intended to limit their referendum powers, as Buckeye suggests. The constitution does not dictate how municipalities may incorporate a referendum provision into their governing mechanism; nor does it place restrictions upon the nature of the referendum provisions municipalities may employ. The constitution simply reserves to municipalities the power to incorporate a referendum procedure in order to ensure that decisions made by a municipality's governing body are in keeping with the views of its citizens." We agree with the court of appeals' interpretation of this constitutional provision.

{¶ 19} Section 1f, Article II reserves initiative and referendum powers with respect *to all questions* which municipalities may be authorized by law *to control by legislative action*, and such powers are to be exercised in the manner *provided by law*. By its very terms, Section 1f, Article II is not a "self-executing" provision. *State ex rel. Bramblette v. Yordy* (1970), 24 Ohio St.2d 147, 53 O.O.2d 348, 265 N.E.2d 273. Rather, Section 1f, Article II requires ancillary legislation to be effective, and, absent specific *legislative action* by the governing body, "it merely indicates principles [the right of initiative and referendum] without laying down rules giving them force of law." Black's Law Dictionary (6 Ed.1990) 1360, defining "self-executing constitutional provision."

{¶ 20} To carry Section 1f, Article II into effect, the General Assembly has enacted legislation covering municipal initiative and referendum matters.[1] See

---

1. The General Assembly has also enacted legislation with respect to referendum powers involving county and township zoning matters. See R.C. 303.12(H) and 519.12(H). In *Cook-Johnson Realty*

R.C. 731.28 through 731.41. However, these sections do not apply to "any municipal corporation which adopts its own charter containing an initiative and referendum provision for its own ordinances and other legislative measures." R.C. 731.41. Rather, that source of authority is found in Sections 3 and 7, Article XVIII. In *Bramblette*, 24 Ohio St.2d at 149, 53 O.O.2d at 349, 265 N.E.2d at 274, we stated:

"Essentially, we have held that Section 1*f* of Article II (as contrasted to Section 1*d* of Article II) is not 'self-executing'; that *either* the General Assembly, by the enactment of statutory 'law,' or the people of the municipality, by the adoption of charter 'law' under the 'home-rule' provisions of the Constitution, may exempt certain classes of laws from the operation of referendum * * *; that charter provisions, if so adopted, will apply * * *; R.C. 731.41; and that where there are no charter provisions the exercise of such power is only as provided for by the General Assembly * * *." (Emphasis *sic.*) (Citations and footnote omitted.)

{¶ 21} In *Bramblette*, this court held that a municipality may, by charter, exempt an ordinance levying a municipal income tax from referendum proceedings. In reaching this conclusion, the court stated:

"In providing for referendum, however, a municipal charter is not restricted to the adoption of the same provisions enacted by the General Assembly. It may be *less restrictive* as to use of the referendum, as was the Charter of the city of Toledo which authorized referendum on *all ordinances*, including one levying a tax

---

*Co. v. Bertolini* (1968), 15 Ohio St.2d 195, 200-201, 44 O.O.2d 160, 162-163, 239 N.E.2d 80, 84, this court held:

"What the General Assembly has done in Section 519.12, Revised Code, is to provide the people of the several townships with a power to veto, by use of the device of referendum, zoning resolutions passed by township trustees.

"We find no constitutional impediment to a grant of legislative power by the General Assembly to township trustees to make zoning resolutions, nor for the General Assembly to reserve the power of referendum to the people who will be affected by such resolutions. Therefore, Section 519.12, Revised Code, insofar as it accomplishes these purposes of the General Assembly, is constitutional."

passed as an emergency measure. *State ex rel*. *Snyder v. Bd. of* Elections (1946), 78 Ohio App. 194 [33 O.O. 519, 69 N.E.2d 634]. It may be *more restrictive*, as in *Dillon v. Cleveland, supra * * **, where a referendum would have been required under state law, but was not required under the provisions of the Charter of the city of Cleveland." (Emphasis added.) *Bramblette*, 24 Ohio St.2d at 150, 53 O.O.2d at 350, 265 N.E.2d at 275.

{¶ 22} Thus, given the holdings from this court, and applying Section 1f, Article II as written, we disagree with appellants that Section 1f effectively limits referendum powers reserved in a municipal charter to only those actions of council that are purely legislative in nature. The fact that the charter provision reserves the power of referendum on "any ordinance or resolution," which may involve administrative as well as legislative matters, does not stand as an impediment to the constitutional validity of the powers reserved to the citizens of Cuyahoga Falls in their charter. See 5 McQuillin, Municipal Corporations (3 Ed.Rev.1996) 289, Section 16.54 ("The power of initiative or referendum may be conferred by the sovereignty upon a municipality with respect to any matter, legislative or administrative, within the realm of local affairs; and often the power, as conferred, is extensive, including all ordinances and resolutions and practically all actions that might be taken by a municipal council."). See, also, *State ex rel. Hauck v. Bachrach* (1958), 107 Ohio App. 71, 76, 7 O.O.2d 402, 405, 152 N.E.2d 311, 315 ("Section 7 of Article XVIII seems to confer upon any municipality the power to frame and adopt for its government without any limitation whatever as to its form or the distribution of power among its departments. The electors of the community have the option of organizing under any one of the optional statutory forms or any hybrid thereof, or of adopting the old New England 'town meeting' system, or any conceivable new or old form, provided it is based on the will of the electors, expressed in the manner prescribed in Article XVIII of the Constitution.").

**{¶ 23}** In analyzing the scope of authority conferred upon municipalities by Section 7, Article XVIII, appellees correctly point out that "the people of a chartered city can create any form of government they want. There is no requirement that a charter city have a planning commission or even a city council. The people need not hire any planning experts. The people of a city can choose to require that all legislation and site plans be approved by a majority of the voters in a town meeting. * * * In other words, they may reserve to themselves the power to have a direct democracy on all legislative and administrative functions of the city. The power of local self-government means nothing less. * * *"

**{¶ 24}** Appellants direct our attention to *Myers* and *Srovnal*, and assert that those cases "control the outcome of this case." Appellants contend that both *Myers* and *Srovnal* stand for the proposition that administrative determinations by a legislative municipal body are not subject to referendum "regardless of whether the municipality is chartered or not."

**{¶ 25}** In *Myers*, paragraphs one and two of the syllabus, we held:

"1. Under Section 1f of Article II of the Ohio Constitution, municipal referendum powers are limited to questions which municipalities are 'authorized by law to control by legislative action.'

"2. The passage by a city council of a resolution granting a permit for the operation of a sanitary landfill, pursuant to an existing zoning regulation, constitutes administrative action and is not subject to referendum proceedings."

**{¶ 26}** In *Srovnal*, we relied upon *Myers*, and held:

"Where the city council, under favor of the city's Planning and Zoning Code, by resolution confirms the action of the city planning and zoning commission granting a zoning use exception as to height regulations for a hotel and office building, which exception will not, in the judgment of the commission, substantially and permanently injure the appropriate use of neighboring property, and the applicant for such use exception files notarized consents of the owners of

11

89.47 percent of the area of the land deemed by the commission to be immediately affected by the proposed zoning use exception, such resolution is not legislative but is an administrative act and is not subject to the referendum provisions of R.C. 731.29."

{¶ 27} At first glance, both *Myers* and *Srovnal* appear to be supportive of appellants' contentions. However, both cases are distinguishable and are not applicable here. In neither *Myers* nor *Srovnal* did we determine whether a charter provision could constitutionally authorize citizens to challenge the actions of a municipal legislative authority. To be sure, neither *Myers* nor its progeny, *Srovnal*, dealt with referendum powers granted by charter. Thus, appellants' reliance on these cases is misplaced.

{¶ 28} Appellants also cite *Forest City Ent., Inc. v. Eastlake* (1975), 41 Ohio St.2d 187, 70 O.O.2d 384, 324 N.E.2d 740, as further authority for the proposition that the passage of Ordinance No. 48-1996 was not subject to referendum proceedings. In that case, a landowner challenged a city charter provision that required that any change in land use agreed to by the city council must be approved by fifty-five percent of the voters in a city-wide election. Relying on *Myers*, the *Eastlake* court, in Part II of the opinion, indicated that a charter provision could not provide for a referendum with respect to administrative determinations made by city council. In *Eastlake*, the court stated:

"Under the provisions of Section 3, Article VIII [of the charter], *all* changes in land use require approval by city council. On its face, the charter provision makes no distinction between those changes made by council in an administrative capacity, and those made by council in a legislative capacity. Thus, the requirement of a mandatory referendum falls upon all changes with equal weight. Insofar as this purports to mandate a referendum as to an administrative determination, it is clearly invalid.

"* * *

12

"However, construing the mandatory referendum requirement as applying only to those land-use changes granted by council acting in a legislative capacity, we must determine whether such a requirement denies appellant due process of law." (Emphasis *sic*.) (Citations omitted.) *Id*., 41 Ohio St.2d at 191, 70 O.O.2d at 386, 324 N.E.2d at 743-744.

{¶ 29} The *Eastlake* court then held that the municipal charter provision at issue was an unlawful delegation of legislative power in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. However, the court in *Eastlake* did not address the scope of referendum power with respect to the authority conferred upon municipalities by Sections 3 and 7, Article XVIII of the Ohio Constitution. Rather, the court in Part II of *Eastlake* simply relied on our holding in *Myers*, which, as noted above, did not involve referendum powers granted by a charter. In this regard, we specifically disapprove of the dicta in Part II of *Eastlake* to the extent that it may be interpreted to undermine the authority conferred upon chartered municipalities by Sections 3 and 7, Article XVIII.

{¶ 30} Furthermore, we also note that, on appeal, the United States Supreme Court overruled the part of *Eastlake* wherein this court held that the charter provision providing for a mandatory referendum was an unlawful delegation of legislative power. See *Eastlake v. Forest City Ent., Inc.* (1976), 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132. Specifically, the United States Supreme Court held that such a provision in a charter was constitutional, and stated:

"The conclusion that Eastlake's procedure violates federal constitutional guarantees rests upon the proposition that a zoning referendum involves a delegation of legislative power. A referendum cannot, however, be characterized as a delegation of power. Under our constitutional assumptions, all power derives from the people, who can delegate it to representative instruments which they create. See, *e.g*., The Federalist No. 39 (J. Madison). In establishing legislative

bodies, the people can reserve to themselves power to deal directly with matters which might otherwise be assigned to the legislature. *Hunter v. Erickson*, 393 U.S. 385, 392 [89 S.Ct. 557, 561, 21 L.Ed.2d 616, 623] (1969).

"The reservation of such power is the basis for the town meeting, a tradition which continues to this day in some States as both a practical and symbolic part of our democratic processes. The referendum, similarly, is a means for direct political participation, allowing the people the final decision, amounting to a veto power, over enactments of representative bodies. The practice is designed to 'give citizens a voice on questions of public policy.' *James v. Valtierra* [(1971), 402 U.S. 137], at 141 [91 S.Ct. 1331, at 1333, 28 L.Ed.2d 678, at 682]." (Footnotes omitted.) *Eastlake v. Forest City Ent., Inc.*, 426 U.S. at 672-673, 96 S.Ct. at 2361-2362, 49 L.Ed.2d at 137.

{¶ 31} Therefore, we hold that Sections 3 and 7, Article XVIII of the Ohio Constitution confer upon municipalities the authority "to exercise all powers of local self-government." Section 1f, Article II of the Ohio Constitution does not limit that authority. Accordingly, in accordance with Sections 3 and 7, Article XVIII, the people of a municipality may, by charter, reserve to themselves the power to approve or reject, by popular vote, any actions of city council regardless of whether such actions are administrative or legislative in nature.

{¶ 32} In *State ex rel. Doerfler v. Otis* (1918), 98 Ohio St. 83, 94, 120 N.E. 313, 316, we held that "[w]here the language of a charter is plain, clear, and unambiguous, it must be given its usual and ordinary meaning, and if such construction is not in accord with the intent and purpose of the electors the remedy is by amendment of the charter." Section 2, Article IX of the charter is plain, clear, and it unambiguously states that the people of Cuyahoga Falls "have the power to approve or reject at the polls *any ordinance or resolution* passed by Council, except

14

as hereinafter provided."[2] (Emphasis added.) The exceptions to referendum set forth in the charter are not applicable here.[3] The referendum provision in the charter does not provide for, or even suggest, any distinctions between actions by council that are legislative or administrative in character. In this regard, the people of Cuyahoga Falls have, by virtue of their charter, reserved to themselves the right to exercise a part of their inherent political power[4] and determine what actions of

---

2. Additionally, even assuming, *arguendo*, that Section 2, Article IX of the charter is ambiguous (which it clearly is not), this court has held that any ambiguity in a charter provision should be liberally construed in favor of permitting the people to vote on the issue. See *State ex rel. Sharpe v. Hitt* (1951), 155 Ohio St. 529, 535, 44 O.O. 489, 491, 99 N.E.2d 659, 662 ("This and other courts have declared that constitutional, statutory or charter provisions for municipal initiative or referendum should be liberally construed in favor of the power reserved so as to permit rather than preclude the exercise of such power, and the object clearly sought to be attained should be promoted rather than prevented or obstructed."), citing *State ex rel. Middletown v. Middletown City Comm.* (1942), 140 Ohio St. 368, 24 O.O. 297, 44 N.E.2d 459. See, also, *State ex rel. Lewis v. Hamilton Cty. Bd. of Elections* (1995), 74 Ohio St.3d 1201, 1202, 655 N.E.2d 177, 178 (Moyer, C.J., concurring) ("Active participation in the election process is the foundation of democracy. Whether selecting a candidate for public office or deciding issues of public concern, voting is a basic right without which all other rights become meaningless. It follows that where the Ohio Constitution or statutes establishing the requirement for placing issues on election ballots create doubt, such doubt should be resolved in favor of providing the citizens with access to the ballot."); and *Shryock v. Zanesville* (1915), 92 Ohio St. 375, 386, 110 N.E. 937, 940 ("Meanwhile it is the solemn duty of all courts to keep hands off and to avoid giving to the provisions of the constitution on that subject [initiative and referendum] a strained construction which, by reason of its very burdensomeness and unreasonableness, would tend to depopularize it. Such character of construction is as unwarranted as judicial construction tending to weaken or emasculate the theory [of initiative and referendum].").

3. Section 2, Article IX of the Cuyahoga Falls Charter also provides that "[w]hen the Council by general law or under provisions of general ordinance is required to pass more than one ordinance or resolution necessary to make and pay for any public improvement, the referendum provision shall apply only to the first ordinance or resolution required to be passed and not to any subsequent ordinances or resolution relating thereto. In addition, ordinances providing for an annual tax levy or for improvements petitioned for by the owners of a majority of the foot front of the property benefited and to be specially assessed therefor, and appropriation ordinances limited to the subject of apporpriations [*sic*] shall not be subject to referendum, but, except as herein provided, all other ordinances and resolutions necessary for the immediate preservation of the public peace, health or safety, including emergency ordinances and resolutions necessary for the immediate preservation of the public peace, health or safety, shall be subject to referendum, except that such emergency ordinances and resolutions shall go into effect at the time indicated therein."

4. Indeed, "[a]ll political power is inherent in the people." See Section 2, Article I of the Ohio Constitution.

council are subject to a referendum vote. The people of Cuyahoga Falls have spoken through their charter, and we will not disturb their clear intentions.

{¶ 33} For all the foregoing reasons, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

RESNICK, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., PFEIFER and COOK, JJ., dissent.

_____

**MOYER, C.J., dissenting.**

{¶ 34} I respectfully dissent because the citizens of a municipality may not exercise powers of referendum, by charter or other means, greater than those powers granted by Section 1f, Article II of the Ohio Constitution.

I

{¶ 35} Paragraph one of the syllabus in the majority opinion states that Section 1f, Article II of the Ohio Constitution does not limit the authority of municipalities to exercise the powers of self-government conferred by Sections 3 and 7 of Article XVIII. I disagree.

{¶ 36} While the Home Rule Amendment grants broad powers to municipalities, the scope of those powers is confined by the remaining clauses of the Constitution. Section 3, Article XVIII provides, "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." In *Canton v. Whitman* (1975), 44 Ohio St.2d 62, 73 O.O.2d 285, 337 N.E.2d 766, this court interpreted Section 3, Article XVIII: "This section, adopted in 1912, preserved the supremacy of the state in matters of 'police, sanitary and other similar regulations,' while granting municipalities sovereignty in matters of local self-government, *limited only by other constitutional provisions.* Municipalities may enact police and similar regulations under their

16

powers of local self-government, but such regulations 'must yield to general laws of statewide scope and application * * *.' " (Emphasis added.) *Id.* at 65, 73 O.O.2d at 287, 337 N.E.2d at 769. Thus, true sovereignty of municipal governments can be limited only by other provisions of the Constitution with respect to matters that are not of "police, sanitary and other similar regulations." Conversely, it is evident that matters of "police, sanitary and other similar regulations" are subject to the supremacy of state power, *i.e*., "general laws of statewide scope and application," as well as other provisions of the Constitution that may limit the exercise of this power.

{¶ 37} Similarly, we described the limits of charter government by interpreting Section 7, Article XVIII, as follows: "A municipality that chooses to adopt a charter does so in order to manage its own purely local affairs without interference from the state, *with the understanding that those local laws will not conflict with the constitution and general laws.*" (Emphasis added.) *Rispo Realty & Dev. Co. v. Parma* (1990), 55 Ohio St.3d 101, 102, 564 N.E.2d 425, 426-427.

{¶ 38} In *Bazell v. Cincinnati* (1968), 13 Ohio St.2d 63, 42 O.O.2d 137, 233 N.E.2d 864, paragraph one of the syllabus, the court held that a "charter city has all powers of local self-government *except to the extent that those powers are taken from it or limited by other provisions of the Constitution* or by statutory limitations on the powers of the municipality which the Constitution has authorized the General Assembly to impose." (Emphasis added.) Therefore, any exercise of municipal authority under charter and pursuant to Section 3 must not, in order to be valid, conflict with any remaining provision of the Constitution. In essence, the authority to "exercise all powers of local self-government" is a delegation of the power to exercise all powers that are within the bounds of the Constitution.

{¶ 39} The constitutional provision at issue here is Section 1f, Article II, which states that "[t]he initiative and referendum powers are hereby reserved to the people of each municipality on all questions which such municipalities may now or

hereafter be authorized by law to control by legislative action; such powers shall be exercised in the manner now or hereafter provided by law."

{¶ 40} Assuming, without analyzing, that the majority is correct in concluding that Section 1f, Article II is not a self-executing provision, see *State ex rel. Bramblette v. Yordy* (1970), 24 Ohio St.2d 147, 53 O.O.2d 348, 265 N.E.2d 273, governing bodies that may act to execute the powers of referendum and initiative as stated in Section 1f, Article II are municipal legislative bodies, where a municipality is governed by charter, and the General Assembly, which provides governing law on referendum and initiative matters for noncharter municipalities. R.C. 731.28 through 731.41.

{¶ 41} However, when either a city council of a charter municipality or the General Assembly acts to execute the powers of Section 1f, Article II, the powers conferred by such an action cannot, by the very nature of the source, exceed the scope of the referendum and initiative powers contained in Section 1f, Article II. The legislative body may act only to execute those referendum and initiative powers that were reserved to the people of municipalities, by the people of the state, as stated in Section 1f, Article II.

{¶ 42} As the United States Supreme Court stated in *Eastlake v. Forest City Ent., Inc.* (1976), 426 U.S. 668, 672, 96 S.Ct. 2358, 2361, 49 L.Ed.2d 132, 137, "[u]nder our constitutional assumptions, all power derives from the people, who can delegate it to representative instruments which they create." Therefore, to the extent that the action of a legislative body is required to execute power that the people have reserved for themselves, *i.e.*, to execute a nonself-executing provision, the legislative body, in doing so, may not go beyond the power that has been reserved. Such an improper action would violate the intentions of the people of Ohio who established the Constitution, with the principle, among others, that any powers not so kept are assigned by the people, to be considered and decided on behalf of the people, by their representatives in legislative bodies.

**{¶ 43}** Applying these principles to the majority's analysis of the "nonself-executing" nature of Section 1f, Article II, it is apparent that the majority's conclusions are not correct. In arriving at the determination that Section 1f, Article II does not limit the authority of municipalities to exercise local governing power, the majority confuses the original source of authority for initiative and referendum measures. The majority's view implies that all a legislative body must do to execute Section 1f, Article II is enact legislation providing for initiative and referendum rights. Under the majority's conclusions, charter municipalities may grant greater initiative and referendum rights than the General Assembly may grant to noncharter municipalities, despite the fact that the source for granting these powers in both cases is the same—Section 1f, Article II.

**{¶ 44}** For charter municipalities, the source of authority, according to the majority, is "found in Sections 3 and 7, Article XVIII." However, what this truly means is that the *source of authority to carry into effect* Section 1f, Article II, for charter municipalities, is Sections 3 and 7 of Article XVIII. The source of authority to carry into effect Section 1f, Article II, for the General Assembly, is Section 1, Article II. Those provisions used to carry into effect Section 1f, Article II are limited to executing only the powers specified in Section 1f, Article II. There is no constitutional authority given by the people to go beyond the meaning of Section 1f, Article II.

**{¶ 45}** By its syllabus that Section 1f, Article II does not limit the authority of municipalities to "exercise all powers of local self-government," the majority has overlooked that any action to carry into effect the provisions of Section 1f, Article II must be consistent with the limits established by that provision, since *it is the sole constitutional source of referendum and initiative powers.* Otherwise, the meaning of any constitutional provision we deem to be nonself-executing could be altered by the words of the legislation that is enacted to carry the provision into

effect. The grant of local governing power to carry into effect Section 1f, Article II is therefore limited to actions that are consistent with the words of that provision.

{¶ 46} Therefore, an analysis of Section 1f, Article II is required to determine the scope of referendum and initiative powers that the people have reserved to themselves and, correspondingly, what powers are delegated to the legislative branches. It is this analysis that then determines the validity of the charter provision at issue here, *i.e.*, whether the powers of referendum and initiative granted by that charter provisions are within the bounds of Section 1f, Article II.

II

{¶ 47} "The first step in determining the meaning of a constitutional provision is to look at the language of the provision itself." *State ex rel. Maurer v. Sheward* (1994), 71 Ohio St.3d 513, 520, 644 N.E.2d 369, 375. Section 1f, Article II provides, in part, that "[t]he initiative and referendum powers are hereby reserved to the people of each municipality on all questions which such municipalities may now or hereafter be authorized by law to control by *legislative action*." (Emphasis added.) Therefore, whether the submission of the issue to the voters by the city in this case was constitutional turns on the meaning of "legislative action," and if that issue was one that the municipality was authorized to determine by legislative action.

{¶ 48} Words used in the Constitution that are not defined therein must be taken in their usual, normal, or customary meaning. See *State ex rel. Herman v. Klopfleisch* (1995), 72 Ohio St.3d 581, 584, 651 N.E.2d 995, 998; R.C. 1.42. Black's Law Dictionary (6 Ed.1990) 899, defines "legislative" as "[m]aking or giving laws; * * * [a]ctions which relate to subjects of permanent or general character are 'legislative.' " Similarly, "legislative act" is defined as the "[e]nactment of laws. Law * * * passed by legislature in contrast to court-made law. *One which prescribes what the law shall be in future cases arising under its provisions*." (Emphasis added.) *Id*. Accordingly, the phrase "legislative action,"

taken in its usual and customary meaning, is essentially the process by which law is enacted that prescribes what the law shall be in future cases arising under its provisions. The wording of Section 1f, Article II therefore means that initiative and referendum powers are reserved on all questions that a municipality may determine legislatively, *i.e*., on all questions that are resolved by enacting laws that have a general, prospective application.

**{¶ 49}** In determining whether the issue here was one that the city was authorized to control by legislative action, it first must be understood that the distinction by this court in the past, and by the parties here, between "legislative" and "administrative" actions does not truly capture the actual meaning of "legislative action" as stated in Section 1f, Article II. That distinction is incorrect because administrative actions may include, according to general principles of administrative law, the performance of "quasi-legislative," or rulemaking, as well as "quasi-judicial," or adjudicatory, functions. The true determination to be made is whether a city council, acting pursuant to its administrative powers, see *Donnelly v. Fairview Park* (1968), 13 Ohio St.2d 1, 42 O.O.2d 1, 233 N.E.2d 500, paragraph one of the syllabus, is acting in a legislative or judicial capacity. Indeed, the first step in analyzing an administrative action is to determine whether the process is one of adjudication or rulemaking. 1 Koch, Administrative Law and Practice (2 Ed.1997) 45, Section 2.11.

**{¶ 50}** An administrative action that is adjudicatory is a "determination of individual rights or duties." *Id.* It is a decision-making process that applies "preexisting standards to individual circumstances," and uses the specific facts of the case "to decide whether a given rule is applicable." Any resultant policy making is incidental to the dispute. *Id.* at 46. See, also, *Londoner v. Denver* (1908), 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103. Administrative adjudications are often initiated by private citizens. "Private individuals find that they cannot engage in a certain conduct or activity without clearance from an administrative agency." 2

Koch at 119, Section 5.31.  "[T]he applicant will first receive an administrative determination and the hearing will result only if the applicant chooses to challenge the result of that determination.  One aspect of an application for a license or permit is that there are competing private interests."  *Id*.

{¶ 51} By contrast, rulemaking is more like the activity of legislating.  See 1 Koch at 47, Section 2.11.  While the processes used to establish rules sometimes differ from typical legislative processes, the objective and the outcome of rulemaking is similar—the implementation of law or policy for the future.  See *United States v. Florida East Coast Ry. Co.* (1973), 410 U.S. 224, 244-246, 93 S.Ct. 810, 820-821, 35 L.Ed.2d 223, 239-240.  Rulemaking is characterized by a focus on general issues that affect future conduct, with an intent on making policy determinations:  "The core facts in rulemaking are general facts.  Rulemaking is investigation rather than individual dispute resolution and hence it is often said to be by nature legislative.  It is a legislative-like activity because it focuses on resolving some sort of policy-type question and not merely resolution of factual disputes."  1 Koch at 48, Section 2.11.  See, also*, Bi-Metallic Investment Co. v. State Bd. of Equalization* (1915), 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372.  Many of the rules established pursuant to the rulemaking process envision some form of public participation, a feature which is not apparent in adjudicatory proceedings.  See 1 Koch at 325-326, Section 4.11.

{¶ 52} The difference between adjudicatory and rulemaking administrative actions is important because city councils may preside over the performance of these functions by a variety of administrative agencies.  "[A] city council may perform not only legislative acts, but administrative acts as well."  *Myers v. Schiering* (1971), 27 Ohio St.2d 11, 13, 56 O.O.2d 6, 7, 271 N.E.2d 864, 865.  "A public body essentially legislative in character may act in an administrative capacity."  *Donnelly,* at paragraph one of the syllabus.  When a city council has acted to approve or exercise final decision over an "administrative action" by an

agency, as has happened in this case, the underlying nature of the act, *i.e.*, adjudicatory or legislative, is critical because it is determinative of whether the final action by city council constitutes "legislative action," or whether council is acting as the final arbiter in an adjudicatory process. If, for example, a city council participates as the final decisionmaker in the rulemaking process by approving the establishment of a rule, then it may be said that the council has acted, albeit in an administrative capacity, by "legislative action." It has acted pursuant to a process that enacts law prescribing what the law shall be in future cases arising under its provisions. By contrast, if a city council has acted as the final decisionmaker in an adjudicatory matter that involves a determination of individual rights or duties by applying preexisting standards to a specific set of facts, then the action taken, whether by resolution or ordinance, cannot be said to be legislative. Rather, council is acting as a final arbiter, which cannot constitute "legislative action" that would permit the people to exercise initiative and referendum rights over such an action pursuant to Section 1f, Article II.

{¶ 53} Applying those principles to this case, it is evident that the Cuyahoga Falls City Council acted in an adjudicatory manner when it passed Ordinance No. 48-1996 approving the plan for "development of land situated in an R-17 Medium Density Multiple Family zoning district in accordance with such district and zoning regulations as stipulated in the Codified Ordinances of the City of Cuyahoga Falls and as approved by the Planning Commission as per the plans and stipulations contained in Planning Commission File P-6-96-SP." By the very words of the ordinance, the action by the council approves the Planning Commission's application of the zoning regulations to Buckeye's plan. Thus, the ordinance is a final determination of an application of the preexisting zoning standards to the individual plan submitted by the appellees. There are no rules approved in the ordinance, of the Planning Commission or any other agency, that are general and prospective in nature. There is no approval of any general public

policy. The action taken by city council was an adjudicatory administrative action, which cannot by any definition fall under the phrase "legislative action" enumerated in Section 1f, Article II. Thus, there are no initiative or referendum rights which may be exercised on this question.

{¶ 54} An analysis of the cases upon which Buckeye relies, *Myers v. Schiering*, and *State ex rel. Srovnal v. Linton* (1976), 46 Ohio St.2d 207, 75 O.O.2d 241, 346 N.E.2d 764, illustrates the correctness of the above approach in analyzing the true nature of "administrative actions" in interpreting "legislative action" under Section 1f, Article II. Like the case here, the underlying administrative actions in both cases were individualized, fact-specific matters which required an application of existing regulations to each circumstance. In *Myers,* the city council passed a resolution granting a permit to operate a landfill. In *Srovnal*, the city council adopted a resolution approving the Solon Planning and Zoning Commission's issuance of a permit to build a hotel and office complex. *Srovnal,* 46 Ohio St.2d at 209, 75 O.O.2d at 242, 346 N.E.2d at 765-766. In both cases, this court held that the actions were not subject to referendum. *Myers*, at paragraph two of the syllabus; *Srovnal*, at syllabus. As in this case, both of the administrative actions there were adjudicatory in nature.

### III

{¶ 55} The majority opinion rests upon the assumption that because of Article XVIII, there is a difference in the initiative and referendum powers enjoyed by charter municipalities as opposed to noncharter municipalities. The majority's distinction is one without a difference. Neither a charter nor a noncharter municipality can grant greater powers than those allowed by the Ohio Constitution. In this case, neither can grant more initiative or referendum power than what is permitted by Section 1f, Article II. An executing action going beyond the scope of Section 1f, Article II is not a valid action because there is no constitutional authority for such an action.

**{¶ 56}** For the foregoing reasons, the judgment of the court of appeals should be reversed.

PFEIFER, J., concurs in the foregoing dissenting opinion.

––––––––––––––––––

**COOK, J., dissenting.**

**{¶ 57}** Section 1f, Article II of the Ohio Constitution reserves the powers of referendum and initiative to the voters of Ohio's municipalities. Under that section, however, referendum and initiative are available only with regard to "legislative action." Nothing in either Section 1f, Article II, or the Home Rule Amendment, permits a municipality to overcome this limitation by adopting a charter that allows for broader powers of initiative and referendum.

**{¶ 58}** The powers of self-government possessed by a municipality pursuant to the Home Rule Amendment to the Ohio Constitution may not exceed the limitations placed on those powers by other constitutional provisions. *State ex rel. Bedford v. Cuyahoga Cty. Bd. of Elections* (1991), 62 Ohio St.3d 17, 20-21, 577 N.E.2d 645, 647-648. Moreover, whether the municipality is chartered or nonchartered is irrelevant: Section 1f, Article II of the Constitution is the sole grant of referendum and initiative powers to both types of municipalities and its limitation applies equally.

**{¶ 59}** For the foregoing reasons, I concur in Part I of Chief Justice Moyer's dissenting opinion.

––––––––––––––––––