OPINION
On September 5, 2000, the Westerville City Council ("Westerville") voted down Ordinance 00-07(A). Ordinance 00-07(A), if passed, would have amended Ordinance 87-77 to approve a "Development Standards Text" and "Preliminary Development Plan" for land located at the southeast corner of Maxtown Road and North State Street in Westerville, Ohio. The land, owned by Richard J. Solove and John J. Chester, Jr. (hereinafter "developers"), had been zoned Planned Community Commercial ("PCC") in Ordinance 87-77.[1] Ordinance 87-77, in addition to zoning the land PCC, approved a comprehensive development plan as required by Section1151.04 of the Westerville City Code, in effect at that time.
The land was not developed, however, and in 1999 the developers proposed a new development plan pursuant to Chapter 1151 of the Westerville City Code, which had been amended in 1995. Such proposal culminated in Ordinance 00-07(A). As indicated above, Ordinance 00-07(A) failed on September 5, 2000.
On October 3, 2000, the developers filed a "notice of appeal" with the Westerville City Clerk and the Franklin County Court of Common Pleas. The developers were attempting to appeal from Westerville's September 5, 2000 "decision" disapproving the developers' Preliminary Development Plan (i.e., proposed Ordinance 00-07[A]). Such "appeal" was purportedly pursuant to R.C. Chapter 2506, which authorizes appeals from final orders or decisions of political subdivisions.
On November 28, 2000, Westerville filed a motion to dismiss, asserting the common pleas court lacked subject-matter jurisdiction. Westerville contended that the matter from which the developers sought to appeal involved legislative action and not an administrative determination and, therefore, was not appealable under R.C. Chapter 2506. Westerville's motion was denied.
On April 30, 2001, an entry of consolidation was filed. Apparently, on December 14, 2000, the developers had filed a declaratory judgment action involving the same issues. The two actions were consolidated. The declaratory judgment action was stayed pending the outcome of the "administrative appeal."
On May 30, 2001, the developers filed a motion for summary judgment arguing that Westerville's denial of Ordinance 00-07(A) was arbitrary, capricious, unreasonable and unsupported by the evidence. The developers asserted, in part, that their development plan proposed a permitted use under the zoning code and, therefore, Westerville had no right to deny the proposed development. Westerville filed a motion to strike the developers' motion for summary judgment on the basis that even if an appeal under R.C. Chapter 2506 was proper, such chapter did not authorize the filing of motions for summary judgment. Further, Westerville filed a motion to strike certain affidavits attached to the developers' motion for summary judgment on the basis that such affidavits were not part of the "administrative record." These motions were denied.
Westerville filed a memorandum contra the developers' motion for summary judgment. Among other things, Westerville argued that the common pleas court lacked subject-matter jurisdiction as the developers had attempted to appeal from a legislative decision, not an administrative determination, and that legislative actions were not subject to judicial review.
On September 25, 2001, the common pleas court rendered a decision and entry. The common pleas court stated that a reviewing court must reverse the findings of a board of zoning appeals when a zoning ordinance is enforced in an unreasonable and arbitrary manner. The common pleas court determined that the development plan included a permitted use and that the denial of the development was unreasonable and arbitrary. Therefore, the developers' motion for summary judgment as to the "administrative appeal" was granted. The common pleas court specifically found that there was no just reason for delay.
Westerville (hereinafter "appellant") has appealed to this court, assigning the following as error:
 1. Because the September 5, 2000 decision from which the Appellees appealed was legislative and not administrative, the trial court erred in overruling the Westerville City Council's November 28, 2000 Motion to Dismiss for lack of subject matter jurisdiction.
 2. The trial court erred in applying the Civil Rule 56 standard to the "administrative" record of the Westerville City Council, instead of the R.C. Chapter 2506 standard.
 3. The trial court erred in overruling the Westerville City Council's July 2, 2001 Motion to Strike the Appellees' May 30, 2001 Motion for Summary Judgment.
 4. Even if, as a general matter, the Civil Rule 56 standard is applicable, the trial court erred in applying that standard in this case, as there was no Civil Rule 56 evidence in the record before the Westerville City Council.
 5. The trial court erred in permitting the Appellees to supplement the record, and in overruling the Westerville City Council's July 2, 2001 Motion to Strike Affidavits of Gregory Comfort and Richard Solove Attached to [the Appellees'] Motion for Summary Judgment and Motion for Summary Judgment.
 6. Even if the trial court properly permitted the Appellees to supplement the record, the trial court erred in not permitting Westerville to conduct discovery.
 7. Regardless of which standard of review it did apply or should have applied, the trial court erred in concluding that the Appellees were entitled to judgment as a matter of law that the Westerville City Council's decision was "unreasonable."
 8. Regardless of which standard of review it did apply or should have applied, the trial court erred in not granting judgment as a matter of law to the Westerville City Council.
Appellant has also filed a "COMBINED NOTICE OF APPARENT MOOTNESS OF TRIAL COURT'S PROCEEDINGS, MOTION FOR SUMMARY ENTRY VACATING TRIAL COURT'S PROCEEDINGS, AND MOTION TO ADMIT EVIDENCE DEHORS THE RECORD." (Emphasis sic.) We address these motions first. Appellant contends, in essence, that these proceedings are moot because the developers (hereinafter "appellees") have allegedly admitted that the development plan which was the subject of Ordinance 00-07(A) was merely a settlement offer rather than a Preliminary Development Plan and Development Standards Text which they intend to pursue.
Appellant's contention is based on statements allegedly made under oath in a related case filed in the Delaware County Court of Common Pleas. Appellees assert that the statements are taken out of context and that they fully intend to pursue their development plans pursuant to the procedures outlined in the zoning code. Therefore, they urge this court to deny appellant's motions.
The bases for appellant's motion to declare this case moot include alleged actions that appellees may take if their plan is approved. Appellant's assertions are based on allegations which are too insubstantial and vague to support a finding of mootness. Appellees vehemently deny the bases for mootness alleged here. What appellees may or may not do with regard to the development plan that formed the basis for Ordinance 00-07(A) is not determinative of the issues before this court. Therefore, we do not find that the controversy before this court is moot.
Accordingly, appellant's motions are denied.
Turning to the merits of appellant's appeal, we address appellant's first assignment of error, which is determinative of this appeal. Appellant asserts that this court and the common pleas court lack subject-matter jurisdiction because appellant's act of not amending the zoning code (by approving Ordinance 00-07[A]) was a legislative action, not an administrative action, and that legislative actions are not appealable under R.C. Chapter 2506. Appellees contend that their property had already been zoned PCC in 1987 and that in rejecting appellees' 1999 development plans, appellant was merely applying existing zoning standards to such plans. Appellees assert that such action was administrative in nature and, therefore, subject to judicial review under R.C. Chapter 2506.
In order to resolve this issue, we must determine whether appellant's action in rejecting Ordinance 00-07(A) involved legislative action or administrative action. In general, legislative decisions are not appealable pursuant to R.C. 2506.01. Moraine v. Bd. of County Commrs. (1981), 67 Ohio St.2d 139, 144. Indeed, the adoption or amendment of a zoning regulation or ordinance or the denial of an amendment to a comprehensive zoning plan is a legislative act. Donnelly v. Fairview Park (1968), 13 Ohio St.2d 1, 3; Moraine at 144. However, a city council may perform not only legislative acts but administrative acts as well. Myers v. Schiering (1971), 27 Ohio St.2d 11, 13. For example, the refusal to approve a resubdivision that comes within the terms of a zoning regulation already in existence is an administrative act. See Donnelly at 3.
The test for determining whether the action of a legislative body is legislative or administrative is whether the action taken is one enacting a law, ordinance or regulation or is an action executing or administering a law, ordinance or regulation already in existence. Donnelly at paragraph two of the syllabus. In the case at bar, the process of developing a piece of property under PCC standards culminates in the passing of an ordinance. However, just because an ordinance is passed (or is voted down) does not make the decision or action a legislative one. The Donnelly test requires an examination of the nature of the action taken rather than the mere form in which such action is taken. Buckeye Community Hope Found. v. Cuyahoga Falls (1998), 82 Ohio St.3d 539, 544.
Appellees' main contention is that their property has already been zoned a PCC district and, therefore, appellant was acting administratively in determining that appellees' plans did not comply with existing zoning regulations for PCC districts. Appellant asserts that this case involves a so-called Planned Unit Development ("PUD") and that the Supreme Court of Ohio has held that not only does the creation of a PUD constitute legislative action, but the implementation of a PUD also involves legislative action. This reasoning was adopted because of the nature of PUD zoning as compared to more traditional zoning.
In Gray v. Trustees of Monclova Twp. (1974), 38 Ohio St.2d 310, the Supreme Court addressed the nature of PUD zoning, which was then a new concept in zoning. The Supreme Court stated that PUD zoning permitted those aspects of land development that were normally regulated by zoning to vary within a geographically-defined area by bearing a single zoning classification. Id. at 311. In Gray, the PUD at issue was a residential-type PUD, and the Supreme Court noted that within such a PUD, which is often a self-contained unit, there may be found single-family dwellings, multi-family units, schools, open spaces, recreational facilities and other collateral nonresidential uses. Id.
In Gray, a Monclova Township Zoning Resolution stated that:
 "In view of the trend toward the development of group houses, planned neighborhoods, shopping centers or other planned developments * * *, which may necessitate variations from existing zoning classifications or regulations, such variations may be permitted provided that a plat showing location of building and yard requirements is first approved by the [zoning] commission. Upon approval by the board of trustees and the filing of such plat with the county recorder, such changes shall be, and become part of the zoning regulations, subject to such further changes as may be made in the prescribed manner."
Id. at 311-312.
In 1966, the Board of Trustees of Monclova Township utilized the above legislative scheme to approve a plat of a planned residential development which included single and multi-family units, two golf courses and a site upon which a clubhouse (with a swimming pool, putting green and tennis facilities) was to be located. Id. at 312. The country club experienced financial problems, and the developers requested an amendment to the PUD plat to allow, in part, an expansion of the clubhouse and the attachment thereto of seven corporate condominium structures. Id. at 312-313. The request was approved, and residents of the planned community filed an action seeking a declaration of the parties' rights under the original 1966 plat and the amendment. Id. at 313-314.
In reviewing the action, the Supreme Court noted that under Monclova's zoning laws, the location of buildings and yard requirements must appear on a PUD plat and once approved, the specific development plans disclosed on the plat became part of the township's zoning regulations, thus requiring the developer to comply with such plans. Id. at 314. The Supreme Court stated that the action of the board in approving such a plat is the functional equivalent of traditional legislative zoning, even though the entire PUD area is covered by the same "nominal" zoning classification both before and after approval of the plat. Id. The Supreme Court noted that the overall zoning classification in a PUD area could be termed "nominal" because such classification does not, by itself, indicate the specific zoning restrictions in the area; rather, the restrictions are ascertainable only by referring to the approved plats for the development. Id. at note fn. 4. In addition, the approval of an application to amend a previously approved PUD plat is equivalent to legislative rezoning, even though there is no change in the nominal zoning. Id.
This line of reasoning was followed in Peachtree Development Co. v. Paul (1981), 67 Ohio St.2d 345. In Peachtree, the developer sought to develop a tract as a Community Unit Plan ("CUP") and, therefore, submitted a plan for the use and development of the tract. The property was zoned "Residence A-2," which was subject to certain requirements and restrictions. The developer's proposed CUP included plans that varied from such requirements and restrictions. Id. at 347. The board of county commissioners approved the developer's CUP request, and referendum petitions were circulated and approved, thus placing the approval of the CUP on the ballot. Id. at 347-348. The developer filed an action in common pleas court seeking a declaration that the resolution approving the CUP was not subject to referendum. Id. at 349.
The Supreme Court stated that one of the issues was whether the board's approval of the CUP constituted a legislative action which was subject to referendum. Id. at 350. The Supreme Court set forth the Donnelly test and also indicated that it had guidance from Gray, which had stated that the approval of a PUD plat was the functional equivalent of traditional legislative zoning, even though the PUD area is covered by the same nominal zoning classification both before and after the approval of the plat. Id. at 350-351. The Supreme Court held that the creation of the CUP concept, through the amendment of the county's zoning resolutions creating a new zoning classification, was a legislative act subject to referendum. Id. at 351.
In addition, the Supreme Court held that the implementation of the CUP, as well as its creation, was a legislative act subject to referendum. Id. In other words, the approval of the developer's CUP proposal was a legislative action because it altered the zoning classification of the land at issue. Id. This was true even though the land at issue had been and always remained zoned as Residence A-2. Id. at 352. The Supreme Court quoted footnote four of Gray, wherein it had stated that the overall zoning classification in a PUD area could be termed nominal because the specific zoning restrictions are ascertainable not by such classification but only by referral to the approved plats. Id. Accordingly, the approval of the CUP was a legislative act that was subject to referendum. Id.
PUDs were again the subject in State ex rel. Crossman Communities of Ohio, Inc. v. Greene Cty. Bd. of Elections (1999), 87 Ohio St.3d 132 . In Crossman, the developer applied to rezone its land from Agricultural District ("AG") to Planned Residential District ("PD-1"). Id. at 132. The Fairborn City Council approved the developer's concept plan and rezoned the area from AG to PD-1 by way of resolution. Id. After this, a separate resolution was passed approving the developer's preliminary development plan. Id. Finally, a third resolution was adopted, approving the developer's final development plan. It was this third resolution that was the subject of the litigation before the Supreme Court.
A referendum petition was filed seeking the voters' approval of the third resolution. The developer and others filed protests with the board of elections asserting that the resolution approving the final development plan constituted administrative action that was not subject to referendum. Id. at 133. The referendum petitioners and neighboring property owners filed a mandamus action in the court of appeals, seeking a writ compelling the board of elections and city to submit the third resolution to the electors in the general election.[2] Id. at 134.
Again, the Supreme Court cited the Donnelly test for determining whether an action is legislative or administrative. Id. at 136. The Supreme Court then stated that in applying the Donnelly test to cases involving PUDs, a more specific analysis had been developed. Specifically, the Supreme Court stated that it had held that the implementation of a PUD, as well as its creation, is a legislative act subject to referendum because the action of approving a plat is the functional equivalent of traditional legislative zoning, although the entire PUD area is covered by the same nominal zoning classification both before and after the approval of the plat. Id. at 136-137, citing State ex rel. Zonders v. Delaware Cty. Bd. of Elections (1994),69 Ohio St.3d 5, 11; Peachtree; Gray, supra. In line with this reasoning, the Supreme Court held that the passing of the third resolution, which approved the final development plan, constituted a legislative act because it implemented the PUD. Crossman at 137. We note that was so even though the land had already been zoned PUD at the time of the third resolution.
Under the reasoning set forth in the above cases, it is clear that in determining whether an action involving PUDs is legislative or administrative, the action must be examined in order to ascertain whether such action enacted a law, ordinance or regulation or merely executed or administered a law, ordinance or regulation already in existence. In so analyzing, it must be noted that not only the creation of a PUD, but the implementation of the PUD — even if such implementation occurs at a separate time and in a separate action — involves a legislative act. This is so because the mere designation or classification of an area as a PUD (or its equivalent) can be nominal only, as the actual restrictions upon and standards applicable to such property may only be found in the development plans or plat submitted by the developer and approved by the legislative body. It is under this analysis that we examine what occurred in the case at bar. If the legislative body merely applies existing zoning standards or restrictions, then the action is administrative and is appealable under R.C. Chapter 2506.
At the time the subject property was initially zoned a PCC district, 1987, Section 1151.01 of the Westerville City Code stated:
PURPOSE.
 The purpose of the Planned Community Commercial District is to encourage superior design and function in shopping center development that offers desirable alternative to strip-type centers. Through integrated and harmonious design, landscaping, varying of building setbacks, development of pedestrian traffic systems and other similar elements, more efficient, successful and pleasant shopping facilities can be created to fulfill this purpose.
Section 1151.03(a) and (b) set forth minimum and maximum development standards as to lots and buildings. Section 1151.03(c) stated, in part:
 Site Development Requirements in the Planned Community Commercial District are:
* * *
 (4) The site shall be developed as a unit with respect to design and construction, and the person seeking to develop the land must demonstrate that he has the capacity to comply with this requirement.
 (5) A comprehensive development plan must be approved by the Planning Commission which includes all the following:
 A. Type of construction, square footage, location and size of all proposed structures. Entrances, type of tenancy expected, and service and pedestrian areas shall be shown for the first phase of development. Structures and uses proposed for subsequent phases of development shall be schematically indicated.
 B. A traffic concept including traffic patterns, streets, service roads, access, bikeways, pedestrian walkways and traffic control points. * * *
 C. Proposed phases of development of the land in terms of structures, land area, streets, access and use.
* * *
F. A detailed parking layout plan * * *.
* * *
 H. A preliminary plat conforming to the applicable subdivision regulations.
Section 1151.04 set forth the procedure for approval of a development and stated:
 No land within a Planned Community Commercial District may be developed until a comprehensive development plan has first been approved as provided in this section.
 (a) * * * An application seeking to develop land in a Planned Community Commercial District shall be filed with the secretary to the Planning Commission, together with ten copies of a comprehensive development plan * * *.
 (b) Procedure for Approval. The secretary of the Planning Commission shall submit the application and the comprehensive development plan to the Planning Commission for its review and recommendations. In determining the acceptability of the comprehensive development plan, the Planning Commission shall consider all relevant factors including setbacks, distances between buildings, yard space, suitability of open space systems, traffic accessibility, and other elements having a bearing on the overall acceptability of the comprehensive development plan as it relates to the orderly development of land within the City. The Planning Commission shall forward its recommen-dations to Council for final approval or denial. * * * If the application and comprehensive development plan are approved by Council, the terms of the comprehensive development plan shall be considered binding conditions upon which development may proceed.
 (c) The Development Plan as a Binding Condition. Development shall be in conformance with the comprehensive development plan and construction of site improvements must be commenced within two years of Council approval; otherwise no development of land shall take place until a new comprehensive development plan is approved pursuant to this section.
 * * * Development of land shall not proceed prior to final approval of the comprehensive development plan. Any development undertaken without such final approval is in violation of this Zoning Ordinance and is an abatable nuisance. [Emphasis added.]
Hence, in 1987, no land within a PCC district could be developed until a comprehensive development plan had been approved by appellant. Once a comprehensive development plan was approved, such plan was binding upon the actual development of the land. In 1987, appellant did approve a comprehensive development plan submitted by appellees by way of passing of Ordinance 87-77. Ordinance 87-77 states, in pertinent part:
 TO AMEND PART ELEVEN OF THE CODIFIED ORDINANCES AND THE ZONING MAP OF THE CITY OF WESTERVILLE REZONING A 30.289 ACRE TRACT OF LAND * * * FROM GENOA TOWNSHIP RESIDENTIAL TO PLANNED COMMUNITY COMMERCIAL (PCC) AND TO APPROVE THE DEVELOPMENT PLAN FOR SUCH PARCEL.
 WHEREAS, the rezoning of the area hereafter described has been proposed * * *; and
 WHEREAS, a comprehensive development plan for the development of said area has been proposed * * *;
* * *
 BE IT ORDAINED BY THE COUNCIL OF THE CITY OF WESTERVILLE, OHIO:
 Section 1. That Part Eleven of the Codified Ordinances and the zoning map of the City of Westerville, Ohio, which is a part hereof, be and the same are amended as follows:
 That the * * * tract of land * * * is rezoned from Genoa Township Residential to Planned Community Commercial (PCC).
* * *
 Section 3. That the comprehensive development plan as required by Section 1151.04, which was submitted by the applicant in conjunction with the rezoning request, is hereby approved subject to and conditioned upon completion of the following to the satisfaction of the City:
 (a) That a final development plan be submitted for Planning Commission's review and approval prior to actual construction of the site[.]
Thus, at the same time the comprehensive development plan was approved, the land at issue was rezoned from residential to PCC. There can be no question that this action was legislative as, at the very least, it changed the zoning classification of the land from residential to PCC. In addition, it approved a comprehensive development plan which contained the actual standards applicable to the site.
However, the development project contemplated in the 1987 comprehensive development plan approved by appellant never occurred. Indeed, there is no evidence that any improvements were made to the property, other than appellant's construction of Huff Road in 1994 and 1995. In addition, Ordinance 87-77 stated that the comprehensive development plan was approved subject to, among other things, a final development plan being submitted to and approved by the Planning Commission. There is no evidence that such a final development plan was submitted and/or approved. Under former Section 1151.04(c), construction of site improvements must have been commenced within two years of approval and if not, a new comprehensive development plan had to be submitted before development could take place.
Regardless of why the development under Ordinance 87-77 never occurred, the fact is that construction of site improvements did not commence within two years of appellant's approval of such. Accordingly, in order for development to take place, a new comprehensive development plan had to be approved. In the interim, Chapter 1151 had been amended in 1995.[3] Under the new procedure, appellees had to submit a "Preliminary Plan" that contained a "Development Standards Text." See Section 1151.01(b). Appellees submitted a Preliminary Plan.
The Westerville Planning Commission recommended that appellees' Preliminary Plan not be approved. Appellees then took the Preliminary Plan to appellant. Appellant voted down the proposed ordinance, Ordinance 00-07(A), which would have approved the Preliminary Plan and Development Standards Text. It is from this action that appellees brought the present R.C. Chapter 2506 "appeal." As indicated above, appellees contend that appellant's action in voting down Ordinance 00-07(A) was administrative because the land had already been zoned PCC in 1987 in Ordinance 87-77. Appellees assert that because the land had already been rezoned into a PCC district in 1987, all that was required under Chapter 1151 was the submission of a Preliminary Plan and Development Standards Text — as opposed to a request for rezoning.
Appellees argue that in passing on appellees' proposal, appellant was merely determining whether the development proposal complied with existing PCC standards, which was an administrative act. In support of their argument, appellees point to current Chapter 1151, which appellees assert contains highly detailed zoning standards applicable to developments in PCC districts. Appellees argue that such standards are far from nominal and, therefore, a ppellant was acting administratively in applying these specific and already-existing zoning standards to the Preliminary Plan and Development Standards Text.
Appellant contends that the classification of a tract as PCC is a mere nominal designation and that the actual zoning standards applicable to such tract are not set forth in Chapter 1151 generally, but are found only in the specific Preliminary Development Plan and Development Standards Text submitted by a developer and approved by appellant. Appellant argues that the designation of the property in 1987 as a PCC district is a hollow shell because there are no accompanying standards under which construction must occur. Indeed, the 1987 comprehensive development plan, which contained the standards applicable to the property, lapsed when no construction was commenced within two years of appellant's approval of such standards. Appellant contends, therefore, that there are currently no zoning standards for the property and that there will be no standards unless and until a new development plan is approved under Chapter 1151. Hence, appellant asserts that in voting down appellees' Preliminary Plan and Development Standards Text, it was acting in a legislative manner and that such action is not subject to an R.C. Chapter 2506 administrative appeal.
Appellant contends that it would be erroneous to conclude that the general provisions in Chapter 1151 are the zoning standards under which development of a site is to be measured. Appellant asserts that such "standards" are not the end of the analysis but are merely the beginning. In essence, appellant's position is that even though a tract of land may be zoned PCC and despite the standards in Chapter 1151 which set forth the minimum requirements for PCC districts, there are no actual standards applicable to a piece of property unless and until a specific Preliminary Plan and Development Standards Text is submitted and approved via a legislative act by appellant. Based on the case law discussed above and the language of Chapter 1151 itself, we agree with appellant.
It is clear from a reading of Chapter 1151 that a PCC district is more than a mere zoning classification imposed generally upon a tract of land. Rather, Chapter 1151 contemplates that a particular piece of property will be zoned a PCC district simultaneously with the approval of specific and individualized standards, unique to that property, which are set forth in a Development Standards Text. For example, Section1151.06(a) states:
 As part of the request for rezoning to a Planned Community Commercial District, a Preliminary Plan must be submitted to the Planning Commission along with the text of all applicable development standards. City Council must approve the zoning change, Preliminary Plan and Development Standards Text. A Zoning Certificate will not be issued for any site or portion thereof until a Development Plan is approved by the Planning Commission and found in conformance with the adopted Preliminary Plan and Development Standards.
 (1) Preliminary Plan. The Preliminary Plan is a conceptual plan submitted at the time of a request for rezoning generally describing the proposed uses for the site to be rezoned and their relationship with surrounding properties and uses. * * * [Emphasis added.]
Further, Section 1151.08(a) states:
Submission of Application for Preliminary Plan.
 (1) Prior to filing an application for rezoning to a Planned Community Commercial District, the applicant shall meet with staff in a pre-application review meeting to discuss the requirements for a Preliminary Plan and Development Standards Text which are required as part of the rezoning request.
 (2) The applicant shall submit the rezoning application along with the required number of copies of the proposed Preliminary Plan and Development Standards Text in accordance with the submission schedule established by the Planning Commission. * * * [Emphasis added.]
Section 1151.06(a)(1) lists the elements that must be contained in the Preliminary Plan, which include such things as noting the major trees that will be removed as part of the development, a schematic plan showing the general development of the tract and the location of existing and proposed structures, a conceptual landscaping plan, and a proposed schedule or phasing of development of the site.
Section 1151.06(a)(2) addresses the Development Standards Text and states:
 A Development Standards Text shall be submitted as part of the Preliminary Plan and shall, through a narrative and graphics, as necessary, in order to detail the development standards to be applied to the development concept described in the Preliminary Plan. The Development Standards Text should clearly identify any standard that is less than the standards established by this Chapter. * * * Unless specifically modified by the Development Standards Text, the standards established by this Chapter shall apply to the proposed development.
Chapter 1151 fits within the Supreme Court case law which recognizes the general concept of PUDs and the idea that not only the creation of a PUD but the implementation of a PUD as well involve legislative action. Section 1151.04 does contain a list of development standards. However, such section specifically states that the standards are to be considered minimum standards within every district designated PCC and that such standards serve as base standards to be included and modified, if desired, as part of the Development Standards Text and Preliminary Plan and as further refined in the Development Plan. In other words, every PCC district has as a base the minimum standards set forth in Section1151.04. However, the developers of an individual tract of land must submit a detailed Development Standards Text as part of the Preliminary Plan, and it is such plan that contains the actual zoning standards for that particular piece of land. Such Preliminary Plan includes individualized and unique features such as which major trees will be removed.
Section 1151.01 sets forth the purpose and intent of the Chapter. Such section states:
 (a) Based on the premise that the ultimate quality of a particular environment is determined not only by the type and arrangement of land uses but also the way in which such uses are developed, the procedures outlined in this Chapter are designed to:
 (1) Encourage imaginative site and architectural design.
 (2) Permit creation of flexible development standards that respect the unique characteristics of the site and surrounding uses.
 (3) Result in more efficient and beneficial use of land.
 (4) Regulate development and redevelopment of individual parcels within already improved areas.
 (b) In order to accomplish the above purpose, the intent of this Chapter is to allow the applicant to lessen the development standards in some areas in exchange for an increase in development standards in another. The process for achieving the above purposes and intent is to require the submission and approval of a Preliminary Plan for the total proposed development and the submission and approval of a Development Plan for all or any part of the are defined in the Preliminary Plan * * *. As part of the Preliminary Plan, the applicant must prepare and submit a Development Standards Text that identifies any development standard that is less restrictive than the standards set forth in this Chapter or other referenced Chapters. * * * [Emphasis added.]
It is clear that the designation of a tract of land as a PCC district, with nothing more, is essentially an empty shell. Appellees contend that their property has already been rezoned PCC. If we accepted appellees' contention that all appellant had to do was apply the existing minimum standards set forth in Chapter 1151 to appellees' Preliminary Plan and Development Standards Text, then there would be nothing unique about appellant's PCC District regulations as compared to its more traditional commercial zoning regulations. There would have been no need to include the language in Section 1151.01(a) about "particular" environments, "imaginative" site design, or "flexible" development standards that respect the "unique characteristics" of the site. Chapter 1151 would be just another zoning classification with set standards. Chapter 1151 clearly does not contemplate such; rather, Chapter 1151's scheme is merely the shell into which more particularized, unique and individual standards are placed. Such standards become the actual zoning requirements for that particular piece of property, and the actual development of such site must conform to these particularized standards. The end result is legislative zoning, for that particular piece of property, and from which lies no appeal under R.C. Chapter 2506.
Again, the scheme set forth in Chapter 1151 contemplates the type of zoning which, as set forth by the Supreme Court under the case law addressed above, constitutes legislative action. However, appellees assert, and the common pleas court agreed, that Zonders, supra, is on point and compels a finding that appellant's action in voting down Ordinance 00-07(A) was administrative in nature. We disagree.
The language in Zonders relied upon by appellees and the common pleas court is as follows:
 In sum, the enactment of a new PUD classification that is not tied to any specific piece of property is a legislative act subject to referendum. Peachtree, supra. However, where specific property is already zoned as a PUD area, approval of subsequent development as being in compliance with the existing PUD standards is an administrative act which is not subject to referendum. R.C. 519.021; Jurkiewicz [v. Butler Cty. Bd. of Elections (1993), 85 Ohio App.3d 503], supra. Finally, the application of preexisting PUD regulations to a specific piece of property which is zoned under a non-PUD classification (the situation here) effects a rezoning of the property and is thus a legislative act subject to referendum. Peachtree, supra. [Emphasis added.]
Zonders at 13.
The common pleas court found that under Zonders, the original act of creating this area a PCC district was a legislative action. However, the common pleas court held that once the zoning was approved, appellant merely acted administratively in determining whether the subsequent development plan complied with the existing PCC zoning. The common pleas court found support for this conclusion in the second sentence from Zonders quoted above: "[h]owever, where specific property is already zoned as a PUD area, approval of subsequent development as being in compliance with the existing PUD standards is an administrative act which is not subject to referendum." Id. The common pleas court erred in relying on this sentence in support of its conclusion.
In Zonders, the owner of land filed an application with the Genoa Township Trustees to rezone her property (and thus amend the zoning map) from rural residential to planned residential district. Id. at 5. The proposed development text, which was attached to the application, indicated that the planned residential district would contain single-family detached dwelling units, with nearly 50 percent of the area being occupied by open space. Id.
The planning commission recommended approval of the application and proposed development and in October 1993, the trustees voted to accept this recommendation, thus rezoning the property from rural residential to planned residential. Id. at 5-6. Property owners and other citizens filed petitions for a referendum on the rezoning. Id. at 6. The developer of the property filed a written protest against the referendum petition, asserting that R.C. 519.021 precluded a referendum on the resolution that rezoned the property. Id. The board of elections agreed, and the property owners filed a writ of mandamus seeking to compel the board of elections to place the zoning resolution on the ballot. Id. at 5-6.
At issue in Zonders was whether or not R.C. 519.021 precluded a referendum on the trustees' approval of the application to rezone the property to a planned residential district. In general, R.C. 519.12(H) had provided that amendments to a zoning resolution were subject to referendum. R.C. 519.021 authorized townships to establish or modify planned-unit development regulations. In Zonders, the Supreme Court construed R.C. 519.021, which stated, in pertinent part:
 "* * * No approval of a planned-unit development as being in compliance with the standards of approval established under this section, if any, shall be considered to be an amendment or supplement to the township zoning resolution for the purpose of section 519.12 of the Revised Code."
Id. at 8.
The Supreme Court held that this language in R.C. 519.021 did not preclude a referendum with respect to the rezoning of the land. Id. at 6. The Supreme Court noted that the relators had not asserted that the trustees' approval was erroneous because the proposed PUD did not comply with the provisions in the zoning code; rather, the relators had attacked the rezoning of the area from rural residential to planned residential. Id. at 10. The question for the Supreme Court was whether the language in R.C. 519.021 quoted above included the initial act of rezoning. The Supreme Court concluded that R.C. 519.021 did not exempt from referendum the initial rezoning of property from one classification to another. Id. at 12. The Supreme Court then went on to set forth the three situations quoted above and found that the case before it involved the third situation, where preexisting PUD regulations were applied to a specific piece of property that was zoned under a non-PUD classification. Id. at 13.
Zonders is not applicable to the case at bar for two reasons. First, Zonders involved a specific Revised Code section applicable only to townships. Indeed, the Supreme Court specifically cited R.C. 519.021 in support of the second sentence quoted above. Thus, Zonders is limited in this regard and is not applicable to the issue presented here, which involves a city's zoning code and not R.C. Chapter 519. Further, even a general application of the principles set forth in Zonders does not dictate that we conclude the action of appellant in voting down Ordinance 00-07(A) was an administrative determination. Appellees contend that the situation presented here falls under the second sentence presented on page 13 of Zonders. Specifically, that the property here was already zoned PCC and that the non-approval of appellees' development plan as not being in compliance with the existing PCC standards was an administrative act. However, as addressed above, the standards that will apply to this particular piece of property have yet to be determined and/or approved.
Likewise, the holding in Buckeye Community Hope Found., supra, does not dictate a different result. In Buckeye Community Hope Found., the Supreme Court held:
 The passage by a city council of an ordinance approving a site plan for the development of land, pursuant to existing zoning and other applicable regulations, constitutes administrative action and is not subject to referendum proceedings.
Id. at paragraph three of the syllabus.
Buckeye Community Hope Found. did not involve a PUD-type development. There was no change to the zoning classification. The ordinance at issue merely approved the planning commission's application of existing zoning regulations to the site plan. Therefore, the action of city council was administrative in nature. Id. at 545.
Again, it would be erroneous to simply conclude that the standards for this piece of property already exist in Chapter 1151 and that such standards need only be applied to appellees' proposal. This conclusion would be adverse to the whole concept of PCC and other PUD-like zoning. Again, Crossman, Peachtree and Gray tell us that not only is the creation of a PUD district (i.e., the initial rezoning of a tract as PUD) a legislative action, but the implementation of a PUD district (i.e., the approval of a specific plat, for example) is also a legislative action. It is worth repeating the Supreme Court's statement in Peachtree that, as in Gray, the overall zoning classification as a PUD is nominal only because such classification does not indicate the specific zoning restrictions in the area, and such restrictions are ascertainable only upon referral to the plats approved for development. Peachtree at 352.
Under the scheme set forth in Chapter 1151, the restrictions for the property would be found in the approved Preliminary Plan, Development Standards Text and Development Plan. Under Section 1151.06(a), a zoning certificate will not be issued for any site or portion thereof until a Development Plan, which conforms to an adopted Preliminary Plan and Development Standards Text, is approved, and development must be conformance with such Development Plan. The process leading up to and including the adoption or rejection of the Preliminary Plan, Development Standards Text and Development Plan is the functional equivalent of traditional zoning and, therefore, constitutes legislative action.
At oral argument in this case, counsel for appellees asserted that under Chapter 1151, appellees had the option of meeting only the minimum standards set forth therein and, presumably, with no further inquiry into the acceptability of the plan. This assertion is wrong. Again, the statutory scheme set forth in Chapter 1151 contemplates more than just another blanket zoning classification. For example, Section1151.06(a)(1)(H) states that the Preliminary Plan should contain, among other things, any additional information required by the Planning Commission that is necessary to determine that the proposed development meets the intent and purposes of a PCC district. Even more telling is Section 1151.07(a), which sets forth the bases for approval of a Preliminary Plan:
 (1) That the proposed development is consistent in all respects with the purpose, intent and applicable standards of the Zoning Ordinance.
 (2) That the proposed development is in conformity with appropriate comprehensive planning or portion thereof as it may apply.
 (3) That the acceptability of setbacks, distances between buildings, yard space, suitability of open space systems, traffic accessibility and other elements having a bearing on the overall acceptability of the Development Plan shall contribute to the orderly development of land within the City.
 (4) That any modifications [of] minimum development standards * * * are properly identified and adequately justified * * * as necessary to insure a higher quality development.
* * *
 (6) That the plan provides for the coordination and integration of individually designed buildings into one planned district.
Hence, even if appellees submitted a plan that conformed in all respects to the base standards set forth in Chapter 1151, with no modifications thereto, the plan still had to conform to the intent and purpose of Chapter 1151. The setback lines, even if they met the minimum requirement(s) set forth in Section 1151.04, still have to be such that they contribute to the orderly development of land in the entire city of Westerville. The proposed buildings, even if they conformed to the maximum height of forty feet as set forth in Section 1151.04(a)(2)(A), must still be such that they are coordinated and integrated with one another in the single planned district. Clearly, compliance with the base standards is not the end of the analysis; rather, it is merely the shell into which more particularized standards may be placed.
Hence, the idea contemplated in Chapter 1151 is that once a Development Plan is approved, such plan will contain the standards applicable to that individual PCC district and to no other property that may also be zoned PCC. That individual piece of property, even if nominally classified PCC, has no standards under which development and construction may commence until such particularized standards are approved under Chapter 1151. The approval of such standards — the implementation of the particular P C.C. district — constitutes legislative action.
In conclusion, because appellant's action in voting down Ordinance 00-07(A) was legislative in nature, appellees had no appeal rights under R.C. Chapter 2506. Moraine, supra at 144. Accordingly, the common pleas court had no subject-matter jurisdiction over appellees' so-called "appeal" from appellant's rejection of Ordinance 00-07(A). The common pleas court's judgment, therefore, is void ab initio, and this court has the inherent power to vacate void judgments. See Patton v. Diemer (1988), 35 Ohio St.3d 68, paragraph four of the syllabus.
For the foregoing reasons, the judgment of the Franklin County Court of Common Pleas is vacated.
Judgment vacated; motions denied.
DESHLER and BRYANT, JJ., concur.
[1] The 1987 ordinance indicated that the land was also owned by "Bank One, Columbus, N.A., Trustee."
[2] The matter was before the Supreme Court on a writ of prohibition to prevent the board from conducting the election on the referendum issue. Id. at 134.
[3] Section 1151.08(a)(4) of the current law requires submission of a new preliminary plan if construction does not begin within five years of council approval of a preliminary plan.